**H. B. DEAL CONSTRUCTION CO., a Corporation, Plaintiff-Respondent,**

v.

**LABOR DISCOUNT CENTER, INC.,**
a Corporation, Defendant,

**A. L. Uebel, Trustee, Charles W. Sunderman, James S. Barnes, Trustee, General Title Service Corporation, a Corporation, State Bank and Trust Company of Wellston, a Corporation, Mercantile Trust Company National Association (Formerly Security Trust Company), a Corporation, American National Bank in St. Louis, a Corporation, The Brentwood Bank, a Corporation, City Bank, a Corporation, North County Bank and Trust Company, a Corporation, and Seventeen Ninety-Five Dunn Road, Inc., a Corporation, Defendants-Appellants,**

and

**Hartman-Walsh Painting Company, a Corporation, R. B. Cleveland Company, a Corporation, Asphaltic Concrete Corp., a Corporation, Grinnell Company, Inc., a Corporation, Crescent Planing Mill Company, a Corporation, Bridges-Jarell, Inc., a Corporation, M. D. Magary, d/b/a M. D. Magary Construction Company, Guarantee Electrical Company, a Corporation, and Vic Koepke Excavating and Grading Company, Inc., a Corporation, Defendants-Crossclaim-ants-Respondents.**

No. 51939.

Supreme Court of Missouri,
Division No. 1.

Sept. 11, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 9, 1967.

———◆———

Leo F. Laughren, St. Louis, for plaintiff-respondent, H. B. Deal Construction Co.

William M. Ward and Thomas R. McGinnis, St. Louis, for defendant-cross-claimant-respondent, R. B. Cleveland Co.

M. A. Ochsner, St. Louis, for defendant-cross-claimant-respondent, Asphaltic Concrete Corp.

Meyer & Traeger, Clayton, for defendant-cross-claimant-respondent, Bridges-Jarrell, Inc.

Rassieur, Long & Yawitz, St. Louis, for defendant-cross-claimant-respondent, Guarantee Electrical Co.

Robert C. Jones, Herbert W. Ziercher, Ziercher, Tzinberg, Human & Michenfeldder, Clayton, for defendants-appellants.

Oliver F. Erbs, Kirkwood, for Crescent Planing Mill Co.

A. Wimmer Carr, Bertram W. Tremayne, Jr., Tremayne, Joaquin, Lay & Carr, Clayton, for M. D. Magary.

Eugene P. Walsh, Harold S. Goodman, St. Louis, for respondent-cross-claimant, Hartman-Walsh Painting Co.

Fred J. L. Schuler, Charles M. Schmidt, Clayton, for Vic Koepke Excavating and Grading Co., Inc.

HOUSER, Commissioner.

This is an equitable proceeding to impress a mechanic's lien on the real property located at 7995 Dunn Road in an unincorporated area of St. Louis County in the amount of $178,182.80 plus interest and to have the mechanic's lien declared superior to the lien of a deed of trust and a security agreement of record. Plaintiff is the general contractor, H. B. Deal Construction Company, a corporation. Defendants named in the petition are the owner, Labor Discount Center, Inc.; A. L. Uebel, trustee, and Charles W. Sunderman, beneficiary, of a $2,000,000 deed of trust on the property; the trustee and named beneficiary, General Title Service Corporation, named in a security agreement affecting the property; six banks claiming a beneficial interest in the two million dollar deed of trust, and nine other mechanic's lien claimants, five of whom were subcontractors and four of whom were contractors who dealt directly with the owner. An excavating and grading contractor who also contracted directly with the owner was permitted to intervene and Seventeen Ninety-Five Dunn Road, Inc., purchaser of the land and improvements at a foreclosure sale under the two million dollar deed of trust, conducted after the institution of this action, was added as a defendant.

Defendant Labor Discount Center, Inc. filed an answer and cross-petition seeking damages against the six banks for breach of contract, fraud and conspiracy. On motion the trial court ordered the separate trial of the mechanic's lien controversies and the issues raised in that cross-petition, so those issues are not involved in this appeal.

Defendant State Bank and Trust Company of Wellston, General Title Service Corporation and the latter's trustee, filed answers and a counterclaim against the general contractor for $316,141.48 damages from the filing of mechanic's liens by the general contractor and its subcontractors.

The five subcontractors each sought judgment against the general contractor for the balance due on their accounts and the four defendants contracting directly with the owner asked judgment against the owner for the balance due each of them. Each of these defendants by crossclaim or crossbill also prayed for a mechanic's lien upon the buildings, improvements and land. Appropriate answers and replies were filed.

Judgment was rendered (1) for the general contractor and against the owner for a total amount of $197,604.73, including interest, fixing a mechanic's lien against the property and declaring the mechanic's lien superior to the liens of the deed of trust and security agreement; (2) for the five subcontractors and the four original contractors and against the general contractor for the amounts of their respective claims, which were adjudged to be paid out of the judgment in favor of the general contractor (also fixing a mechanic's lien on the property for each of the nine and adjudging their liens superior to the liens of the deed of trust and security agreement); (3) for the general contractor and against the bank, title service company and its trustee on the counterclaim; (4) declaring the aggregate judgment of $228,172.46 plus interest paramount to the purchase by Seventeen Ninety-Five Dunn Road, Inc. at foreclosure of the property under the two million dollar deed of trust, and (5) declaring the judgment final for the purpose of appeal under § 512.020, V.A.M.S.

The six banks, the title service company and its trustee, and the purchaser at foreclosure appealed. The owner did not appeal.

On November 29, 1962 the then beneficial owners of the approximately 106-acre tract in question contracted with Labor Discount Center, Inc. for its sale and purchase. On the same day the beneficial owners and the record title holder executed quitclaim deeds conveying the tract to Labor Discount Center, Inc., subject to an out-

standing note and deed of trust on the property.

On December 5, 1962 Labor Discount Center, Inc. entered into a contract with H. B. Deal Construction Company as general contractor for the erection thereon of a building to be used as a discount house and shopping center. Deal contracted to furnish all material and do all work according to specifications and drawings prepared by the architects and to erect and construct the commercial building, parking area, fences, sidewalks, appurtenances and improvements as provided for in the contract documents, for the actual cost of the work plus a fixed fee of $50,000, "guaranteeing the total cost of the work described in this contract, including said Fixed Fee, shall not exceed the sum of One Million Two Hundred Fifty Thousand And No/100 Dollars ($1,250,000.00)." This sum was referred to in the contract as "The maximum guaranteed sum." The contract was made contingent upon the signing of a satisfactory construction and dispersing escrow agreement providing for the deposit with the escrowee of the funds necessary for the payment of the contract amount. In a supplemental agreement it was provided that the maximum guaranteed price was based on several specified changes in the plans and specifications, and that "The contract price only includes the items of work clearly outlined in this contract, and does NOT include any work in connection with tenant changes, which are not indicated on the drawings." Article 8 dealt with the securing of payment of the fixed fee of the general contractor. Article 15 of the General Conditions made provisions for changes in the work, as follows: "The Owner, without invalidating the Contract, may order extra work or make changes by altering, adding to or deducting from the work, the Contract Sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

"In giving instructions, the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the Owner signed or countersigned by the Architect, or a written order from the Architect stating that the Owner has authorized the extra work or change, and no claim for an addiion (sic) to the contract sum shall be valid unless so ordered. ·

"The value of any such extra work or change shall be determined in one or more of the following ways:

"a) By estimate and acceptance in a lump sum.

"b) By unit prices named in the contract or subsequently agreed upon.

"c) By cost and percentage or by cost and a fixed fee."

On December 5, 1962 (the date of execution of the construction contract) the general contractor's project manager, John Mincher, who was instructed to "get the job going," spent 3 hours visiting the site, walking over the ground to acquaint himself with any of the problems involved in the site work. On December 6 he returned to the site and spent 4 hours getting acquainted with the conditions such as trees and amount of grading to be done, preparatory to awarding subcontracts. On December 10 he and a laborer performed surveying work to determine the limits of the property in order to locate the building. With a survey in hand the project manager had the laborer dig to locate the corner markers, which were overgrown with brush and had to be cleared out. The brush was cut or chopped. He found sufficient corner markers by which to locate the building. On December 14 he and a laborer each spent 3 hours digging for markers and cutting brush for lines. To establish the location of the building it was necessary to

clear out the underbrush which obstructed the view. After locating the property lines the building was located on the plot by using a surveyor's transit and a tape. A level survey was run to confirm the elevations on the drawings and check the quantities estimated by the excavators. The site required a substantial cut in the front and a substantial fill in the back. Stakes were set to level the site, indicate the necessary cut and fill, and balance the cuts and fills to get an elevation to accommodate the building. These were 2 x 2 inch oak stakes, driven into the ground, marked with chalk to indicate the number of feet and inches to cut or fill. The next work was done on December 18, 4 hours each for project manager and a laborer, again cutting brush for lines and levels and doing the same kind of work done on December 14. On December 19 the authorities issued a building permit to the owner. On that date the two men worked a total of 8 hours doing the same type of work and on December 20 four hours were charged to the job for estimating quantities (office work). Work was charged to the job on December 24, 26, 31 and January 3, 4, 7 and 8, 1963. Groundbreaking took place on January 8, 1963. The construction work continued without interruption until the work was completed. The general contractor furnished the last item of material and labor with its forces on February 4, 1964. The last item furnished by a subcontractor was in April, 1964. The building was built according to the plans, specifications, contract, allowances and change orders, in a good and workmanlike manner. Owner accepted the building as complete and the work under the construction contract was accepted by owner as fully performed. The first tenant moved into the building in September, 1963.

Interim financing for the discount house and shopping center was arranged with six local banks, of which defendant State Bank & Trust Company of Wellston (hereinafter "the Wellston bank") was the lead bank. Permanent financing was arranged in October, 1962 with the pension fund of the Teamster's Union, at which time the owner was given a commitment to lend it $1,666,000. Relying on that commitment the six banks, on December 18, 1962, gave owner a written commitment to lend it for construction funds the sum of $1,900,-000 "to be secured by a valid and merchantable first deed of trust" on the property. The commitment further provided that the debt be secured by the execution and delivery to the banks "at the time of the first draw" of a principal note in the amount of $2,000,000 secured by a valid first deed of trust on the property, the note and deed of trust to be guaranteed by a title insurance company. Further provisions required the assignment to the six banks of the Teamster's pension fund commitment and committed the six banks to lend owner an additional $175,000 after the completion of the improvements and the placing of the permanent financing by the pension fund, to be secured by a second deed of trust. The pension fund commitment was assigned to the six banks on December 18, 1962. The assignment was acknowledged and agreed to by the pension fund in January, 1963.

On December 19, 1962 the following documents were executed: (1) The owner, Labor Discount Center, Inc., made and executed a promissory note for $50,000 payable to the order of the general contractor, due one year after date of completion of the improvements on the real estate in question, and a deed of trust thereon to secure the note. (2) General Title Service Corporation (hereinafter "the escrowee") acknowledged in writing receipt of the $50,000 note and supporting deed of trust and agreed to hold them in its escrow account until the contract between the contractor and the owner was fully performed and until the owner secured permanent financing and the permanent deeds of trust were recorded, e.g., a first deed of trust in the sum of $1,666,000 and a second in an amount not to exceed $334,000 and agreed to record the $50,000 deed of trust after the permanent deeds of trust were record-

ed, and to deliver the note and deed of trust to the contractor after crediting the note with any payments received in reduction of the fixed fee of $50,000. (3) The owner made and executed a promissory note for $2,000,000 payable to the order of Charles W. Sunderman, due and payable June 1, 1964 with interest at 6% and a deed of trust on the real estate in question to secure the note, which deed of trust was recorded December 21, 1962. (4) The owner made and executed a security agreement by which the owner conveyed the real estate in question to a trustee for the escrowee to secure the owner's performance of its contract with the general contractor. (5) The general contractor, the owner, the escrowee, and the Wellston bank, named as "mortgagee," made and entered into a construction and disbursing escrow agreement. In it the general contractor agreed to build and fully complete the improvements according to the plans, specifications and building contract "for the sum of $1,250,000.00 with all claims for labor and materials paid in full, and free and clear of any and all liens"; agreed not to authorize any payments for labor or materials in excess of the estimated cost of construction including cost of ground ($1,900,000) and until said labor and material were actually incorporated in the construction of the improvements, and agreed not to "permit any changes in or additions to said plans, specifications and contract without written approval of Owner, Mortgagee and Escrowee. Failure to secure such written approval shall render Contractor liable for any cost or damages resulting therefrom and Contractor hereby waives his right to make any additional charge for same." The owner agreed to deposit with escrowee "funds necessary for the completion of said improvements, for all authorized extras, and for payment of all other items under this agreement required to be paid by Owner"; agreed that all funds deposited with escrowee be disbursed for the payment of the construction of the improvements "and all authorized extras," etc.; agreed to deposit with escrowee "the funds for all structural changes in said plans and specifications, in order to secure approval by State, County or Municipal government," and agreed not to "permit any changes in or additions to [the] plans, specifications and contract without written approval of Mortgagee, Escrowee and Contractor, and shall, prior to the construction of any extra items, deposit in cash with the Escrowee a sum sufficient to pay for such extra item or items." The mortgagee agreed to lend the owner $1,900,000, and to accept therefor "pursuant to commitment" a note or notes secured by a first deed of trust on the property; to pay as requested by escrowee the full proceeds thereof to escrowee for the account of the owner, and agreed that all funds received by escrowee be disbursed according to the terms of the agreement. The escrowee agreed to accept and disburse the funds in accordance with the terms of the agreement and to use due care in so doing and reserved the right to withhold approval of any changes or additions in or to the plans, specifications and contract "until additional funds for the same are deposited with it." All of the parties further agreed that "[u]pon completion of the contract if the cost as defined in the contract plus the fee is less than the maximum guaranteed price as modified by allowances or changes in work, the savings, if any, shall be applied to the Contractor's fee and the note for payment of fee shall be reduced accordingly."

Charles W. Sunderman, payee named in the two million dollar note and beneficiary named in the deed of trust securing the note, was an officer in the Wellston bank. A. L. Uebel, trustee, was also an officer in that bank. The deed of trust recited that the note was given for borrowed money but Mr. Sunderman did not lend any money to Labor Discount Center, Inc. He was a mere nominee having no personal interest in the transaction. He endorsed the note to the Wellston bank without recourse immediately upon its execution. Nor did the six banks advance any money to the maker, Labor Discount Center, Inc., or to the es-

crowee for its use, on the two million dollar note. At the trial the vice-president of the Wellston bank took the position that the two million dollar note was not owned by the bank but was the sole property of the maker of the note, Labor Discount Center, Inc. and that the payee, Mr. Sunderman, was acting in the matter for Labor Discount Center, Inc. The bank considered that the two million dollar note and deed of trust given to secure it constituted collateral security deposited by the owner of that collateral (Labor Discount Center, Inc.) to secure a series of promissory notes totaling $1,900,000 which the bank required Labor Discount Center, Inc. to execute as the construction work advanced. This understanding is documented on the reverse side of the first of this series of notes, in the form of a pledge signed by Labor Discount Center, Inc., reciting that the two million dollar note and deed of trust (which Labor Discount Center, Inc. warranted was its own property) were pledged "as collateral security for the payment of the within note." In each of the notes in this series the Wellston Bank was the payee. They were all payable on June 1, 1964. Each bore interest at the rate of 6½%. The bank claimed ownership of this series of notes.

The method by which the general contractor received funds under the banks' commitment to the owner was as follows: The general contractor would send a request for payment, or billing, to owner, accompanied by a voucher drawn on escrowee. If the amount was agreeable to owner the latter would sign and approve the voucher, which would be presented to escrowee. Escrowee would in writing request of the Wellston bank funds for disbursement in the amount requested. The request to the bank would show also the amount advanced previously and the balance to be drawn. The Wellston bank would then issue its check in the amount requested, payable to escrowee, which in turn would issue its check to the general contractor.

The first of the above mentioned series of notes given by Labor Discount Center, Inc. to the Wellston bank was executed on December 21, 1962 in the amount of $600,000. As indicated, on the reverse side of the note the maker warranted that it was in good faith *the owner* of the two million dollar note and first deed of trust and pledged that note and deed of trust *as collateral security* for the payment of the $600,000 note. The proceeds were used to pay the outstanding note and deed of trust which encumbered the property when it was purchased (in the amount of $569,613.28) and the balance was placed in the escrow account for construction purposes.

The general contractor presented to escrowee its first voucher for payment on February 1, 1963 for $30,400. Escrowee requested funds from the Wellston bank to pay this voucher. The bank notified the owner and took from the owner its note dated February 5, 1963 for $32,000, with a pledge on the reverse side of "any and all collateral now in the bank's possession, or hereafter, or any substitutes therefor." The bank then delivered the funds to escrowee which countersigned the order for disbursement and delivered it to the general contractor in payment of its billing. This procedure was followed every time construction funds were requested, until the tenth request for payment dated November 8, 1963 in the amount of $109,648.03, which was not paid. At that time there was no balance left to complete the job. A total of $1,350,000.00 had been billed and $1,240,-351.97 had been paid. Two other requests for payment, one dated January 8, 1964 in the amount of $64,098.06, and the other dated February 21, 1964 in the amount of $3,540.85 were not paid.

They ran out of money before the job was completed because of changes ordered by the owner as the work progressed. From the beginning to the end of construction there were 52 change orders which increased construction costs by considerably more than $150,000. The procedure fol-

lowed by the parties in connection with change orders was as follows: Owner would tell the general contractor what changes were required and request a proposal. When they agreed upon the cost the general contractor would prepare a written change order setting out the work, the cost, and the allowance to be credited or the amount by which the additional work would increase the guaranteed contract amount, and submit it to the owner. Owner would approve and accept the change in writing. At first the owner took the approved change order to the Wellston bank with a request for the bank's written approval as required by the escrow agreement. The official of the bank, relying upon the escrowee, and having delegated to it all of the bank's rights and authority in this respect, told the owner's representative on three or four occasions that if changes were required in order to satisfy the tenants it was not necessary to bring the change orders to the bank; that change orders should be sent direct to escrowee; that escrowee would deliver them to the bank "at the proper time." Apparently whatever escrowee did in connection with the disbursement of funds had the approval of the bank. After having been repeatedly told that the bank did not want the change orders presented to it the owner adopted the practice of sending approved change orders direct to the escrowee. The escrowee knew about the change orders and was informed in writing, as early as July 2, 1963, and thereafter that the guaranteed contract cost was going up. On July 2, 1963 the contract cost stood in the amount of $1,374,146.75, less savings effected in the sum of slightly more than $56,000. Nevertheless escrowee, without raising any question about depletion of the funds by reason of changes and without at any time withholding approval pending deposit of additional funds to cover the growing discrepancy between available funds and billings, issued to the bank its requests for disbursement of funds for the payment of billings as they were presented, until all but $9,648.93 was drawn out.

The bank was not in the dark about the financial problem created by the changes. As early as April, 1963 the vice-president of the owner discussed with the officials of the bank the additional costs and inquired whether the secondary financing could be increased to cover them. He was advised that this could not be done because of the banking laws but that if the Teamster's pension fund would increase its commitment the bank could give the owner the additional financing. In June, 1963 the bank officials told the owner's vice-president that the minute he brought in a commitment from the Teamster's pension fund, raising the amount to $2,400,000, the bank would advance additional interim financing. The president of the general contractor informed the bank in December, 1963 that payment of its last bills had not been received. A bank official told the president that the owner had applied for an increase in the commitment and as soon as the increase came through and became official the bank would increase its loan to the owner, which would enable escrowee to pay the bills. The additional commitment was made by the Teamster's pension fund on January 2, 1964. It was assigned to the bank and its assignment acknowledged and consented to by the pension fund. On January 9, 1964 the bank advanced $59,000 on the increased commitment but failed to advance any additional funds thereon, claiming that another deed of trust had "appeared" that stopped the bank from advancing any more money.

In the summer of 1964 the owner defaulted on a payment of interest. In the fall of 1964 the trustee named in the two million dollar deed of trust foreclosed the deed of trust, selling the land and improvements to Seventeen Ninety-Five Dunn Road, Inc. for the sum of $1,900,000. The beneficial owners of the stock of the purchasing corporation are the six banks.

The circuit court upheld the claims of all who filed mechanics' liens, held that their liens attached both to the land and to the improvments and adjudged their liens prior

and paramount to the lien of the two million dollar deed of trust.

Preliminary to a determination of the matter of priorities is the question whether any lien ever came into existence in favor of either the bank or the general contractor.

■ The general contractor contends that the lending institutions acquired no lien by the execution of the two million dollar deed of trust, on the ground that the note which it supports was given without consideration. We hold that there was consideration for the two million dollar note and deed of trust, namely, the $1,900,000 loaned to the maker of the note. It is true that the parties adopted an unusual method of handling this transaction. The Wellston bank took the position that the note and deed of trust were the property of the maker of the note and not the property of the bank. The maker of the note, by executing notes which described the transaction as a pledge of collateral to secure other notes (the series of notes which the owner signed at the time the funds were dispersed), treated the note and deed of trust as its own. The trustee named in the deed of trust and the payee of the note and named beneficiary in the deed of trust, although officials of the Wellston bank, were said to have acted for Labor Discount Center, Inc. (the borrower). There is no explanation why a note for two million dollars was executed for a loan of $1,900,000, or whether the bank now acknowledges satisfaction of the series of notes totaling $1,900,000. Behind all of these unusual circumstances, however, is the central, all-important and controlling fact that, whatever the mechanics of the procedure, both lender and borrower intended and understood that the two million dollar deed of trust should be and was the basic security for a loan of $1,900,000; that it should be a first lien on the land and on the improvements to be constructed upon the land, and that in case the borrower defaulted the six banks, by exercising their rights through the Wellston bank as pledgee, should have the ultimate beneficial interest in the enforcement of the lien. In a similar situation this Court acknowledged that "a debtor may give two notes for the same indebtedness, one, the principal note, secured by another, as collateral, the collateral note being secured by a deed of trust on real or personal property. In such case, the mortgage securing the collateral note may be foreclosed by the creditor who is entitled to receive the proceeds to pay the sum due on his principal note. Dibert v. D'Arciy et al., 248 Mo. 617, 154 S.W. 1116." Graham v. Finnerty, Mo.Sup., 232 S.W. 129, 131 [2].

■ Appellants contend that the general contractor is not entitled to any mechanic's lien because the general contractor increased the costs of construction in violation of its covenant to complete the construction of the improvements for $1,250,000, which they say is the maximum amount it can recover, and that the general contractor violated paragraph 11 of the escrow agreement which prohibited the contractor from permitting any changes or additions to said plans, specifications and contract without written approval of owner, mortgagee and escrowee. Appellants urge that plaintiff's violations of the contract constitute a waiver of any lien over and above said contract price. We hold that the general contractor's right to a mechanic's lien was not waived and its enforcement was not barred either by reason of the fact that the actual cost of construction exceeded the sum of $1,250,000 or that the Wellston bank and escrowee did not endorse their approval in writing on the change orders. In the escrow agreement the general contractor agreed to build in accordance with the building contract between Labor Discount Center, Inc. and the general contractor, the terms of which were well known to the appellants. In the building contract the contract sum was not a fixed and inflexible sum but was subject to modification by changes agreed to by all. There was no provision in any of the agreements that

the general contractor would not be entitled to a mechanic's lien for labor performed and materials supplied in excess of the basic contract sum. We do not find the general contractor at fault in connection with the change orders. It had the right to make the changes requested by the owner, provided the written approval of the bank and escrowee were obtained. For the protection of the lenders it was the duty of the bank to examine the change orders and withhold approval thereon until the owner made arrangements to finance the additional cost involved, but by its conduct the bank waived its right to withhold such approval. The banking officials told the president of Labor Discount Center, Inc. on three or four occasions that there was no necessity for bringing the change orders to the bank and directed him to take them direct to the escrowee, on whom the bank relied with implicit confidence and to whom we find the bank surrendered its right to pass judgment on the change orders. Under these circumstances there was no duty on the general contractor to insist that the bank give its written approval. Furthermore, it was the contractual duty of the escrowee to withhold approval of any changes or additions until additional funds to pay for them were deposited with it. The escrowee breached its duty in this respect. By their conduct the bank and escrowee waived the provision of the escrow agreement in which the general contractor agreed to waive its right to make additional charges for changes or additions as to which the contractor failed to secure the written approval of the bank and escrowee. (The fact is that the escrowee *did* give its written approval to the change orders by endorsing every voucher form for the disbursement of construction funds submitted to it, with full knowledge in each case of the amount by which the change order increased construction costs, and after receiving letters from the general contractor showing how much the guaranteed contract price was being increased by reason of the change orders.)

In any event, the parties by agreement established a pattern, a routine practice, a method of handling change orders which the parties accepted and adopted as full compliance with and performance of the contract. In such a situation the courts will follow the practice agreed to by the parties. Robson v. United Pacific Ins. Co., Mo.Sup., 391 S.W.2d 855, 862 [14, 15]; Woolfolk v. Jack Kennedy Chevrolet Co., Mo.App., 296 S.W.2d 511, 514 [2, 6].

No requirement having been made by the Wellston bank or the escrowee that additional funds be deposited by the owner to pay for the extra costs of the changes, the initial loan was insufficient to complete the building without going on credit. When the till was empty the general contractor proceeded to complete the building, relying for payment on the mechanic's lien law.

Appellants' argument that the general contractor agreed to absorb any cost over the sum of $1,250,000 by delivering the improvements lien-free at that cost is untenable. The agreement was to deliver the building and improvements described in the original specifications for that price, before costly changes were ordered by the owner. The general contractor did not agree to absorb the additional cost involved in the making of the 52 change orders.

Both the general contractor's mechanic's lien, and the bank's lien arising out of the deed of trust, were in existence and were valid. The vital question is one of priorities as between these liens.

Appellants urge that the court erred in adjudging the mechanic's liens prior and paramount to the lien of the two million dollar deed of trust. They say that the deed of trust having been recorded on December 21, 1962, prior to the commencement of the building or improvements, the court should apply the general rule of lien law that "prior in time is prior in right," and that the lien of the deed of trust should be applied to the entire property, not only to the land but also to the improvements.

The following sections of the statutes, RSMo 1959, V.A.M.S., relate to priorities of mechanics' liens:

"429.050. Priority of lien—improvements removed when—exception. The lien for the things aforesaid, or work, shall attach to the buildings, erections or improvements for which they were furnished or the work was done, in preference to any prior lien or encumbrance or mortgage upon the land upon which said buildings, erections, improvements or machinery have been erected or put; and any person enforcing such lien may have such buildings, erections or improvements sold under execution, and the purchaser may remove the same within a reasonable time thereafter; provided, that nothing contained in this section shall be so construed as to allow any such sidewalk as is mentioned in sections 429.010 to 429.-340 to be so sold under execution or so removed."

"429.060. Lien shall have precedence over subsequent encumbrances. The lien for work and materials as aforesaid shall be preferred to all other encumbrances which may be attached to or upon such buildings, bridges or other improvements, or the ground, or either of them, subsequent to the commencement of such buildings or improvements."

■ A mechanic's lien properly filed dates from the commencement of the building or improvement, § 429.060, or as stated in Riverside Lumber Co. v. Schafer, 251 Mo. 539, 158 S.W. 340, "from the commencement of the work on the building, or the furnishing of the materials therefor." The commencement of the building or improvement, under the "first spade rule" which we recognize in this state, Schroeter Bros. Hdw. Co. v. Croatian "Sokol" G. Ass'n, 332 Mo. 440, 58 S.W.2d 995, 1003, means the visible commencement of actual operations on the ground for the erection of the building or the making of the improvement which makes it apparent that a building has been commenced or that an improvement is to be made, done with the intention and formed purpose to continue the work until completed. 36 Am.Jur. Mechanics' Liens § 167; 57 C.J.S. Mechanics' Liens § 179, p. 732. Boisot on Mechanics' Liens (1897) § 56, says the building is begun "when the first permanent work is done on the land" such as excavation for the foundation, or attaching to the land any material used in constructing a building, or "when the permanent work on the ground has progressed so far as to inform reasonable observers that it is designed for the erection of a building," or "the first labor done on the ground which is made the foundation of the building, and is to form part of the work suitable and necessary for its construction," but that " * * * *laying off the ground for buildings and driving pegs in the ground to mark the location does not constitute a commencement of the building.* Neither does clearing the ground of stumps and other obstructions, that would render insecure the foundations to be built, * * *." (Our emphasis.) In Mark's Sheet Metal, Inc. v. Republic Mortgage Co., Ark. (1967), 414 S.W.2d 106, a preliminary "on-site" inspection of the premises in which the president of a contracting firm determined the direction the house would face by a compass reading and the location of the center of the house on the lot, the use of a tape measure and the driving of a wooden peg into the ground to aid in the use of the tape, was held not to constitute "commencement of the building." In North Shaker Blvd. Co. v. Harriman Nat. Bank, 22 Ohio App. 487, 153 N.E. 909, the presence of steam shovels on the property, the location of test holes, the driving of stakes and other work of similar nature, and in Rupp v. Cline & Sons, Inc., 230 Md. 573, 188 A.2d 146, 1 A.L.R. 3d 815, grading and leveling the lot, were held insufficient to constitute "commencement" of the building. The rule is clearly stated in 57 C.J.S. Mechanics' Liens, § 179 b, p. 732: " * * * [W]ork which, although it may improve the property, is merely preparatory to building operations at some future time, and does not of itself tend to contribute directly to the erec-

tion, such as clearing, leveling, filling up, or fencing the property, * * * does not constitute a commencement for the purpose of fixing the time to which the lien relates, * * *. Also *staking out the plan of the building or the line of foundations, or staking the boundary line of the tract, * * * does not constitute a commencement of the building within the meaning of the lien statutes.*" (Our italics.)

■ The circuit court found that the general contractor "began the erection" of the buildings and improvements on December 5, 1962. Under the authorities, however, the acts performed by John Mincher and his workmen on that date and on the several days thereafter prior to December 21 when the deed of trust was filed for record did not constitute the commencement of the building and improvement within the meaning of § 429.060. Accordingly, the lien of the deed of trust attached on December 21, 1962, before the mechanic's lien, which attached on January 8, 1963. The lien of the deed of trust would be prior and superior to that of the mechanic's lien claimants, in the absence of a contrary statute or rule of law. There is, however, such a statute and under the circumstances of this case there is such a rule of law.

### (1) The statute

Section 429.050, supra, is applicable and by its force a lien in favor of the general contractor and all · other lien claimants whose liens were properly filed attached to the building and improvements in preference to the prior lien of the deed of trust upon the land on which they were put. Appellants asserts that § 429.050 does not apply to construction loan arrangements in which the lender is legally obligated to disburse the proceeds of the construction loan for the improvement of the property and the mortgage is taken not only on the land but also with the expectation that the improvements to be built thereon will provide the major portion of the security for the loan; where the security only comes into being as the improvements are made and the loan proceeds are disbursed. This argument, being a matter for the General Assembly, not the courts, to consider, is advanced in the wrong forum. Section 429.050 is plainly written to encompass *all* prior liens, encumbrances or mortgages, and we cannot construe it to apply to less than all of them. The same question was answered the same way in Drake Lumber Co. v. Paget Mortgage Co., 203 Or. 66, 274 P.2d 804, 814 [13]: "Our statute makes no exception, but manifestly refers to all prior recorded mortgages, whether given for future advances to aid in construction or not. We are not at liberty to import exceptions into the statutes because of possibilities conjured up by counsel that the expectations of a mortgagee concerning the security which he is receiving will be disappointed." And in 57 C.J.S. Mechanics' Liens § 201, p. 760, it is stated that "the general rules governing priority between mechanics' liens and mortgages ordinarily are deemed applicable notwithstanding the loan secured by the mortgage was made with the purpose, understanding, or expectation that the proceeds thereof would be used in improving the property or the mortgage was given to secure a debt for work done on, or materials furnished for, the building."

### (2) The rule of law

■ Under the doctrine of waiver a mortgagee by reason of having induced the furnishing of labor and material may be precluded from asserting the priority of the mortgage over a mechanic's lien. 57 C.J.S. Mechanics' Liens § 204 b. (1), p. 768. The rule was asserted and applied in Magidson v. Stern, 235 Mo.App. 1039, 148 S.W.2d 144 [8, 9]. Stern and wife owned three tenement buildings on which an investment company held a prior deed of trust. The owners wished to build and make substantial additions and alterations which would materially increase the value of the security. The investment company loaned

Stern the money with which to make the improvements with full knowledge of the purpose of the loan and actually paid the money out as the work progressed, some of it directly to the principal contractor or to the subcontractors on his orders. Adverting to the rule that a mortgagee does not waive the priority of his lien by merely consenting or failing to object to improvements made on the property, the court of appeals said, 148 S.W.2d, l. c. 153 [9]: "The admitted facts in the case at bar show clearly that [the investment company] did far more than merely consent, or fail to object, to the making of the improvements. On the contrary, it not only provided the funds to be used in payment for the work, but indeed·actively participated to the extent of writing the checks, and, in instances, making payments directly to the contractors themselves as the work progressed, for which payments it took and retained receipts in its files. * * * It is obvious from the facts and circumstances as shown by defendants' own evidence that the matter of contracting with plaintiff for the improvements was handled by prearrangement with the Sterns and [the investment company] for the benefit of their respective interests in the property; and with [the investment company] having thus induced the furnishing of the labor and material, and having actively participated in the transaction by retaining the proceeds of the improvement loan which it thereafter paid out as the work progressed, it must follow, as the lower court found, that the mechanic's liens for the unpaid balance due for labor and material going into the improvements are to be held prior and superior to the lien of the existing first deed of trust."

The same rule was applied to subordinate a purchase money deed of trust to the lien of a materialman in Jefferson County Lumber Co. v. Robinson, Mo.App., 121 S. W.2d 209, where repairs to existing buildings were made and materials furnished not only with the knowledge and consent of the mortgagee, but also with his active co-operation, pursuant to an agreement between the owner and the mortgagee, under circumstances in which the mortgagee would not have taken back a deed of trust for the purchase price if there had not been an agreement about improvements.

This rule applies in this case. The Wellston bank, mortgagee,[1] not only did not object and consented to the making of the improvements but was a prime mover in making the project possible. Its officials conferred with the president of Labor Discount Center, Inc. with reference to interim financing, arranged with the other five banks for their participation, had the owner assign its commitment from the pension fund to the bank, signed the escrow agreement in which the general contractor promised to build and fully complete the improvements according to the plans, specifications and building contract of which the bank had full knowledge, received all billings and requests for funds, furnished the money for the payment of the billings, took the promissory notes of the owner for the amounts advanced for construction purposes as the work progressed; and otherwise actively participated in the entire transaction. The bank would not have loaned any such sum as $1,900,000 on the bare land without an agreement to build a shopping center on the land. It was to the interest of the bank to procure the services of a general contractor to accomplish the building of the improvements. The bank was one of the signatories to a contract which obligated plaintiff to undertake the project. The arrangements thus made with plaintiff for the doing of the work and the furnishing of the materials were made to redound to the benefit of the bank. On the date the deed of trust was recorded

---

1. The Wellston bank, while not named as cestui que trust in the two million dollar deed of trust, was recognized as a mortgagee by all of the parties and designated as such in the escrow agreement. In law the bank was the beneficial mortgagee and the rights of the parties on this appeal will be adjudicated on that basis.

the bank not only had actual knowledge that a building was to be constructed on this land, but also the bank then knew that the employment of subcontractors by the general contractor was contemplated and that the mechanics and materialmen whose labor and materials were to create the improvement might be expected to file mechanics' liens against the property if their bills were not paid. The bank had much more knowledge about the construction of the improvement than it would have had if its officials had merely visually observed excavation for a foundation (which would have constituted "commencement of the building" and would have been notice to the world that a building was to be constructed there and if done prior to the recording of the deed of trust would have made the mechanics' liens paramount to a subsequently filed deed of trust, under all of the authorities). By its acts and conduct the bank caused, procured and induced all of the direct contractors and the subcontractors to perform the necessary services and to supply the needed materials for the construction of the improvement. Under these circumstances the bank is in no position to insist upon the subordination of the liens of the mechanics and materialmen and is taken to have waived the priority of the lien of the deed of trust in favor of the liens of the mechanic's lien claimants. The plaintiff and the other mechanic's lien claimants, therefore, have a paramount mechanic's lien not only on the improvements (by virtue of § 429.050) but also on the land itself.

Appellants try to differentiate Magidson v. Stern, supra, on the ground that the mortgage in that case was taken on improved property and the improvement consisted of repairs and additions to preexisting buildings. We see no difference in principle between that kind of case and one in which the improvements are built on bare land. The important fact is that the mortgagee actively participated in the transaction whereby the mechanic's lien

claimants were induced to supply the material and perform the labor.

The next point is that the court erred in adjudging that plaintiff's $50,000 fee be recovered as a part of its mechanic's lien.

Article 8 of the construction contract provided: "To secure payment to Contractor of the Fixed Fee of $50,000.00 referred to in Article 3 hereof, it is agreed between the parties hereto that Owner shall execute and deliver to Contractor its negotiable promissory note in the sum of $50,-000.00 to become due and payable one year after date of completion of the work to be performed under this Contract. Said note shall bear no interest prior to maturity and shall bear interest after maturity at the rate of 8% per annum.

"Said note shall be secured by a Deed of Trust encumbering the same Real Estate described in the construction loan for $1,666,000.00 to be obtained by Owner and shall be subject to or subordinated to only the following described construction or permanent Deeds of Trust:

"all notes and deeds of trust executed in connection with the construction loan and permanent financing, the total sum of said notes and deeds of trust, however, not to exceed the sum of Two Million Dollars ($2,000,000.00)

"The above described promissory note and deed of trust in the sum of Fifty Thousand Dollars ($50,000.00) shall be delivered by the Owner to the Contractor upon completion of the work to be performed under the terms of this Contract."

The escrow agreement provided that "* * * upon completion of all improvements and payment of all bills for labor and materials hereunder, any surplus remaining unexpended in the Escrow Account shall be delivered to the Contractor and the amount of indebtedness of Owner to Contractor, being the fixed fee to be earned by Contractor, of $50,000.00, shall be reduced by the amount of such surplus

so delivered to Contractor, and the note or other evidence of indebtedness shall be credited with said surplus amount."

The escrow agreement further provided that "[u]pon completion of the contract if the cost as defined in the contract plus the fee is less than the maximum guaranteed price as modified by allowances or changes in work, the savings, if any, shall be applied to the Contractor's fee and the note for payment of fee shall be reduced accordingly."

There were savings in the awards to subcontractors totaling $82,734.80.

■ Appellants argue that the fee was paid by the note and deed of trust, which they say were intended by the parties to constitute full and final payment. We do not so find. The express wording of Article 8 of the contract indicates that the note and deed of trust were regarded as security for payment, not as payment and satisfaction. There is nothing to show to the contrary.

Appellants further argue that the fee and the security for the fee were to be inferior to all deeds of trust put on the property for the purpose of financing the project. The intention to subordinate is clear, but only if the agreement with reference to the taking of the note and deed of trust was executed. The note and deed of trust were signed and delivered *to the escrowee* (not to plaintiff) to be held in the escrow account until the construction contract was fully performed and the permanent financing should be secured and the permanent deeds of trust recorded. Then (and only then) escrowee was to record the deed of trust and deliver the recorded deed of trust and note to the general contractor after crediting the note with any payments received. If at the time of completion of the contract the general contractor had effected savings resulting in a surplus in the escrow account such surplus was to be delivered to the general contractor in reduction of the fixed fee, and the note credited therewith.

■ The agreement as to the taking of the note and deed of trust was never executed. The permanent deeds of trust were never recorded. The $50,000 deed of trust was never recorded. The note and recorded deed of trust were never delivered to the general contractor. (In order to obtain possession of them for the purpose of making a formal tender to the owner and appellants at the beginning of the trial it was necessary for counsel for the general contractor to call on appellants' counsel to produce them.) A mere agreement by one entitled to a mechanic's lien to accept other security does not amount to a waiver of the lien where such agreement is not executed. Fuhler v. Gohman & Levine Const. Co., 346 Mo. 588, 142 S.W.2d 482, 485 [7]; 57 C.J.S. Mechanics' Liens § 227, p. 801. There was no waiver or forfeiture of the general contractor's right to a mechanic's lien. But for the withdrawals to pay for change orders there would have been an unexpended surplus of $82,734.80 in the escrow account upon completion of all improvements and payment of all bills for labor and materials under the contract as originally written, and plaintiff would have been entitled to the fee in full in cash. Neither the withdrawals nor the failure of the escrowee to insist that additional funds be deposited to cover them was the fault of plaintiff. As it was, the cost was $82,734.80 less than the original contract price as modified by changes in the work, and these savings were properly applied to the payment of the fee by inclusion in the mechanic's lien.

Next, error is assigned in allowing Hartman-Walsh Painting Company a mechanic's lien, based upon a $17,552.17 painting bill. This claimant contracted directly with the owner. It completed its work on November 6, 1963 and filed a mechanic's lien statement on March 27, 1964. In its statement it named as owner of the property only Labor Discount Center, Inc. On May 5, 1964 it

filed its amended mechanic's lien statement in which it named as an additional owner the cestui que trust named in the deed of trust, and within six months thereafter (on November 2, 1964) it filed its cross-claim to enforce the lien. Both original and amended lien statement are identical in the amount claimed due and owing and in all respects other than the recitals of ownership, the date the general contractor began work, and an allegation of priority over the two million dollar deed of trust.

Appellants say that having filed a good and proper lien statement on March 27, 1964 this claimant was required by § 429.-170 to file its action to perfect its mechanic's lien within six months after that date, that is, no later than September 27, 1964 and not having filed its cross-claim until November 2, 1964 ·is not entitled to a mechanic's lien. Hartman-Walsh claims that the March 27 lien statement was defective in that it failed to name the equitable owner of the property and therefore it was justified in filing a new or amended lien statement on May 5, and that ·its cross-claim was timely filed because its action was commenced within six months after May 5. Appellants counter with the argument that it is only when the first statement is *void* that a new six-month period starts with the filing of a proper second lien statement; that the first lien statement was not void or defective; that the second lien statement related back to the first and therefore the cross-claim was filed too late.

■ The first lien statement was defective in that it failed to include the cestui que trust as owner as required by § 429.150: "Every person, including all cestui que trust, * * * shall be included by the words 'owner or proprietor' thereof under sections 429.010 to 429.340, * * *." When this omission was discovered claimant filed a new, complete lien statement "in amendment" of the first one, naming all owners within its knowledge (the record title holder *and* the cestui que trust) in accordance with § 429.080 which provides that "It shall be

the duty of every original contractor, within six months * * * to file with the clerk of the circuit court * * * a just and true account * * * with the name of the owner or contractor, or both, if known to the person filing the lien * * *." When a defective or incomplete lien statement is filed a claimant may at any time thereafter (within the period prescribed for filing lien statements) file a perfect one. The right to file a second lien statement or a new statement in amendment of the first is not confined to cases like Davis v. Schuler, 38 Mo. 24, in which the first statement was void. It extends to cases in which the second corrects an error, South Missouri Lumber Co. v. Wright, 114 Mo. 326, 21 S.W. 811, or an omission, as in the case at bar. The time for the beginning of an action began to run on May 5, which is the date of the filing of the lien statement on which claimant relies. See Lindley v. McGlauflin, 58 Wash. 636, 109 P. 118, 120. Appellants' position was not changed on the basis of the first filing and their rights have been in no way prejudiced by the second filing. The court did not err in this connection.

■ Next, it is urged that the court erred in adjudging that the excavating and grading company was entitled to any mechanic's lien. On August 23, 1963 the grading company was hired by the president of Labor Discount Center, Inc. to "take down" a hill to provide a better line of sight from Interstate Highway 70 to the shopping center and spread the dirt around a road that led to a sewage treatment plant and to backfill around the sewage plant. The work was done under one continuous arrangement. The erection of the sewage plant was part of the original contract between plaintiff and the owner. The last work done by the grading company was performed on January 27, 1964, prior to completion of the work by plaintiff on February 4, 1964. The price charged, $3,468, was fair and reasonable. We consider this work as an essential and integral part of the plan for the construction of the shop-

ping center, appurtenant to the building, and fully lienable. See Vasquez v. Village Center, Inc., Mo.Sup., 362 S.W.2d 588.

■ Finally, appellants say the court erred in adjudging the mechanic's liens of Vic Koepke Excavating and Grading Company and of M. D. Magary, who built an incinerator at the site for $7,780, prior and paramount to the lien of the two million dollar deed of trust, "because the deed of trust was recorded prior to the time said cross-claimants began work as independent contractors, and disbursements under the deed of trust were made before said cross-claimants began work as independent contractors." Magary's mechanic's lien relates back to the first work done by the general contractor on January 8, 1963. There was no abandonment of the work, or break or cessation in the making of these improvements; there was a continuous flow of events from beginning to end. Under the doctrine of waiver, which we have held fully applicable in this situation, the court did not err in adjudging these mechanics' liens prior and paramount to the lien of the deed of trust. The fact that the incinerator was not included in the original plans on which the loan was made does not bar Magary's claim. An incinerator is a basic necessity in the operation of a building in which numerous tenants lease retail stores. It is an integral part of such an improvement. The cases cited by appellants are distinguishable on the facts.

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., SEILER, J., and STORCKMAN, Alternate J., concur.

HOLMAN, J., not sitting.