**Al KRANZ, d/b/a Kranz Construction Company, Respondent,**

v.

**CENTROPOLIS CRUSHER, INC., et al., Defendants,**

and

**Diversified Mortgage Investors and Callaway Mining Company, Appellants.**

**No. WD 32218.**

Missouri Court of Appeals, Western District.

Feb. 2, 1982.

As Modified On Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 2, 1982.

Jerome T. Wolf, Terry W. Schackmann, Spencer, Fane, Britt & Browne, Kansas City, for appellants.

Gordon R. Gaebler, Marion W. O'Neill, Svoboda & Gaebler, P. C., Kansas City, for respondent.

Before SHANGLER, Acting P. J., WASSERSTROM and CLARK, JJ.

WASSERSTROM, Judge.

Al Kranz d/b/a Kranz Construction Company ("Kranz") sued in this case for the value of construction work done by him for Centropolis Crusher, Inc. ("Centropolis") and to establish a mechanic's lien on the land on which the work was performed. The suit was defended by Diversified Mortgage Investors ("DMI") who held a deed of trust on the property and by Callaway Mining Company ("Callaway") who acquired the land after foreclosure by DMI of its deed of trust. DMI and Callaway also filed counterclaims alleging defective work on the part of Kranz and his failure to complete the work which he had contracted to perform. The trial court held for Kranz, allowing him quantum meruit recovery in the amount of $556,321.42, together with prejudgment interest in the amount of $211,889.65 and adjudged a mechanic's lien in favor of Kranz with priority against the

DMI deed of trust.[1] All counterclaims by the defendant were denied. Callaway and DMI appeal.

Centropolis owned land on which it desired to build an underground warehouse facility. It sought financing for this purpose from DMI and Continental Mortgage Investors ("CMI"). In June 1972, negotiations between those parties resulted in a commitment by DMI for a "land loan" in the amount of $2,750,000, to be followed by a "construction loan" by CMI in the amount of $5,250,000, then to be followed in turn by a "take out loan" by DMI in the amount of $8,000,000. The first loan was consummated by note and deed of trust on August 10, 1972. From that loan an engineering fee of $20,000 was paid looking toward the construction of the underground facility. On May 14, 1973, the CMI construction loan was consummated by note and deed of trust. This loan was intended to cover payments to contractors and materialmen, and St. Paul Title Insurance Company was designated as disbursing agent for that purpose. In connection with this construction loan, DMI executed an agreement subordinating its lien under the August 1972 deed of trust to that of CMI.

On June 19, 1973, Centropolis entered into a written contract with Kranz under which Kranz was to do specified excavating and grading work for $322,000, and certain specified concrete work for $388,942. That contract contained provisions for additional payment to be made in the event of changes and for any extra work which might be required.

After Kranz entered upon this project, he encountered many difficulties, largely caused by defaults on the part of Centropolis in what it and its engineers were supposed to do and also arising from a number of changes in the contract plan requiring substantial additional work on the part of Kranz. Kranz made numerous complaints. By early 1974, the parties had come to a state of serious disagreement. The situation deteriorated to the point that the respective positions were reduced to an exchange of letters, which became so voluminous that the engineer in charge testified that they were at the point of "writing letters instead of working." The scope and tenor of the disagreements can be best understood by summarizing the highlights of this exchange of correspondence.

On January 14, 1974, Kranz wrote to Centropolis that: "During the past several weeks we have numerously requested that a meeting, with all parties concerned with this project, be held for the purpose of discussing and resolving pertinent items affecting our contract. It appears that my verbal requests have been ignored. We respectfully request that a meeting time be set within the next forty eight (48) hours, or we will be compelled to cease all operations on January 17, 1974." After intervening letters, Kranz wrote again on March 12, 1974, as follows: "We have performed extra and additional work, pursuant to your instructions, in substantial amounts. We are herewith requesting a meeting at your earliest convenience for the purpose of making a determination of the amount of such increased work and to reach an agreement as to the value of such work, so that a payment request can be submitted. In view of the foregoing, as of now we are shutting down all work, in the open rail cut, until this matter is resolved."

That letter produced a meeting between the parties on March 13, after which the engineer Shoup outlined certain excavating and grading work and requested that Kranz proceed with it. That instruction led to further written debate after which Kranz's lawyer, Charles R. Svoboda picked up the correspondence on April 5 as follows: "A review of your letters of March 28th and 29th, 1974 show that they are inaccurate and unfair, and constitute an attempt by you as agent for the owner to compel Kranz Construction Co. to perform work outside of

1. The trial court found that Kranz had made a limited waiver of its lien on a portion of the land for a portion of the work done by him. This limitation upon the mechanic's lien is not an issue on this appeal. However, that waiver does affect the recalculations in the amendment to the judgment set forth in the Appendix to this opinion.

that as defined by your oral representations and the contract, without fair compensation. On behalf of Kranz Construction Co. a request is hereby made for a wirtten [sic] Field Order for all such work which is outside of the scope of the work as defined by contract and the oral representations, as a great deal of the work described by you in your letter of March 28th will involve additional compensation and an increase in contract price ... I am herewith renewing my request for a joint meeting of all concerned parties at the earliest possible time in the hopes that the issues can be resolved...."

Shoup responded by letter of April 16 stating again "that those items delineated in my letter of March 28, 1974, and as discussed in conference of April 11, 1974, are still considered as part of the contract duties." Svoboda answered the next day in the following language: "You were advised that the work of Kranz Construction Company has been substantially completed. However, completion of the work is being held up pending the performance of the following items which are the responsibility of Centropolis Crusher ... Would you please take immediate steps to see that the above items which are the responsibility of Centropolis Crusher are completed at once so that Kranz Construction Company can finish its work in those areas...."

Shoup responded in turn by letter of April 22 in which he threatened that if the work demanded by him was not promptly performed by Kranz, "then said work will be performed by others as a back charge item to your contract." Svoboda responded by letter of April 23, refusing the Shoup directives and further stated: "As you know you are suggesting that Kranz Construction Company drill and shoot rock to a greater depth than required by their contract. Centropolis Crusher has refused to honor my request on behalf of Kranz Construction Company as set forth in my letter of April 5th to discuss this and other items which would include the amount of compensation to be paid. Since Centropolis Crusher has refused to meet and discuss such changes, the change in the contract suggested by you is refused and you are advised that Kranz Construction Company intends only to drill and shoot to the elevation required in the contract...."

No progress was made toward resolution of the disputes, and Kranz left the project on May 24th. Mr. William K. Poindexter, a lawyer for Centropolis, wrote a letter of protest on that date to Kranz. Svoboda's response to that letter contained certain language which has become a point of considerable controversy on this appeal. The pertinent portions of Svoboda's letter in question dated May 31 are as follows: "On behalf of Kranz Construction Company you are herewith advised that Kranz has by no means abandoned the work but, as a matter of fact, has more than fully performed and completed the quantities and items required by contract. Furthermore, Centropolis Crusher, Inc. has repeatedly breached the contract, interfered with progress of the work and has failed and refused to compensate Kranz Construction Company for labor and material, and losses occasioned by changes in the work ... On behalf of Kranz Construction Company you are herewith advised that the performance of the work required by Kranz Construction Company has been substantially completed and the work items suggested by you constitute work outside of the contemplation of the parties and are not covered by the contract ... The performance by Kranz Construction Company of the work specified by you, which for the most part has already been performed by Kranz, would involve additional cost and expense for which Kranz Construction Company would be entitled to additional compensation. You are advised that I will be happy to meet with you and your client at your very earliest convenience as I have previously offered to do, to resolve the various matters referred to, and if we can reach an agreement satisfactory to Kranz Construction Company as to the nature, scope, magnitude, extent, compensation and timetable of the work items referred to by you, I am sure Kranz Construction Company would enter into a contract to perform such work items...."

The parties found themselves at a complete impasse. Centropolis proceeded to do some of the disputed work by its own workmen and then employed a different concern to finish the work which Kranz had declined to perform. According to Centropolis' figures submitted at trial, the cost of the substitute work came to $53,521.70.

On the basis of very voluminous testimony and documentary exhibits, the trial court made extensive findings, the most important of which for present purposes are as follows: Centropolis committed numerous defaults in its obligations, made many changes in the contract work to be performed, and substantially interfered in the work of Kranz, all of which substantially increased the cost of performance by Kranz. Centropolis and the engineer continuously promised to pay Kranz for the additional work caused to him. Kranz encountered trouble getting together with Centropolis, but he did receive continuous assurances of payment. The trial court finding No. 105 continued: "On or about May 24, 1974, and immediately prior to the time Kranz quit work on the project, Centropolis, without any just cause or excuse and without permission or agreement of Kranz, drilled and shot the perpendicular rock side walls in the open rail cut which were prepared by Kranz in accordance with the plans applicable to such work." As a direct result of Centropolis' conduct in blasting the rock side walls down into the open rail cut on May 24, 1974, Kranz terminated his work on the project and withdrew.

The court further found in paragraph No. 144 that "Kranz did not complete performance of his work under the contract, but quit work and left the project on May 24, 1974 because of Centropolis' action as set forth in paragraph 105." Further in paragraph No. 146 the court found: "Delays in performing Kranz's work were the direct result of Centropolis in failing to provide adequate light and ventilation, in failing to timely remove water from the east mine, in failing to remove a portable crusher from the path of the open rail cut, in changing the plans, in failing to properly schedule the work of other crafts and contractors and in interfering with the orderly progress of Kranz's work." The court further found Centropolis indebted to Kranz after giving credit for payments and credits in the amount of $556,321.42.

The trial court also made detailed conclusions of law including conclusion No. 2 that Centropolis had materially breached the contract in seven specified respects. Conclusion No. 3 was that "By reason of Centropolis' breaches referred to in paragraph 2, Kranz is entitled to bring his claim in quantum meruit." And in Finding No. 21, the court concluded "Said mechanic's liens of Kranz are entitled to priority over the interests, claims and liens of DMI, although DMI's deed of trust was recorded prior to the commencement of Kranz's work, because the loan secured by said deed of trust was made in contemplation of the work and improvements to be made upon the land of Centropolis, was made to facilitate such construction, was used in part to pay for the engineer's work in preparation for the construction and was expressly subordinated to the CMI deed of trust."

For their appeal, Callaway and DMI rely on the following points: (1) that the trial court erred in allowing recovery in quantum meruit and instead should have confined recovery by Kranz to the contract price plus extras computed according to the contract provisions; (2) the trial court erred in declaring the mechanic's lien to be superior to the DMI deed of trust; and (3) the trial court erred in denying a counterclaim by Callaway in the sum of $3,500.

### I.

The total amount of the original Kranz contract was $710,942. Of that original amount, Centropolis paid approximately $685,000, leaving a balance unpaid of approximately $26,000. Callaway and DMI claim that Kranz should be limited to that balance plus such sum as he may be able to prove to be due for extra work under the "changes and alterations" and "extra work and claims" provisions of the contract General Conditions. Appellants point out that

Kranz actually computed (though he did not submit) a claim for extras on that basis, which according to his figures came to $188,764.94. Of course, extras so computed together with the balance of the original contract price would be far less than the $556,321.42 which was allowed here on the basis of quantum meruit.

Appellants' theory of limiting Kranz to the smaller amount insisted upon by them is the recognized rule that where a contractor has fully or substantially performed a contract, he may elect to sue either on the contract or in quantum meruit; but if he elects the latter, then the contract price is prima facie the reasonable value of the services and recovery by the contractor is limited to the contract price plus reasonable compensation for extras and less the amount which the other party has lost by reason of defective or incomplete performance. *Oliver L. Taetz, Inc. v. Groff*, 363 Mo. 825, 253 S.W.2d 824 (1953); *Julian v. Kiefer*, 382 S.W.2d 723 (Mo.App.1964); *Stewart v. Droste*, 294 S.W.2d 600 (Mo.App. 1956).

Kranz counters with the equally well-settled principle that if a contractor has not substantially completed the contract and if his failure of completion is due to defaults on the part of the other party, then the contractor may recover in quantum meruit without being limited to the contract price. *Oliver L. Taetz, Inc. v. Groff, supra; Fuhler v. Gohman & Levine Const. Co.*, 346 Mo. 588, 142 S.W.2d 482 (1940); *Joern v. Bang*, 200 S.W. 737 (Mo.App.1918). The trial court held the rule last mentioned to be applicable and controlling here.[2]

Appellants do not contest the findings that Centropolis materially breached the contract.[3] They do, however, strongly challenge the application of the rule on which the trial court relied, on the contention that regardless of any hindrances that may have been caused by Centropolis, Kranz did nevertheless substantially complete the contract. In support of that contention, appellants rely on the letters written by Kranz and his lawyer and the testimony given by Kranz. Along the same line, appellants rely upon the principle that a party may not change position on appeal from that which he took in the trial court.

By making the foregoing argument, appellants find themselves in the curious predicament of making the very turn-about of which they accuse Kranz. In the trial court these appellants testified and argued at every point that Kranz had not performed his obligations under the contract and had walked off the job with very substantial parts of the work left uncompleted. On the very proposition urged by them, they no more than Kranz should be permitted to take a position here inconsistent with the position they took in the trial court.

However all that may be, the full answer to appellants' contention is that Kranz does not take a position here inconsistent with his trial court position. True, he and his counsel did state repeatedly that his performance was "substantially completed;" but that was meant in a special way. In context, those statements clearly intended to set forth a position that Kranz had done all, and in fact even more than, that which he was obligated to do under the original contract terms. Kranz and his attorney were stating the position that in view of the

2. Another legal principle permits a contractor to proceed in quantum meruit without limitation to the contract price if the parties have abandoned the original contract. The trial court here did not find abandonment. However, the extensive changes in the project, the very substantial increases in work and expense demanded of Kranz, and the failure of cooperation on the part of Centropolis would justify a finding of legal abandonment despite verbal protestations to the contrary. *Schwartz v. Shelby Construction Co.*, 338 S.W.2d 781 (Mo. 1960).

3. Appellants do challenge finding No. 105 and claim that there is no evidence that Kranz terminated its work as a direct result of Centropolis blasting rock side walls into the open rail cut on May 24, 1974. That question need not be pursued since the trial court held that Centropolis breached the contract in a number of other material respects, and those findings amply support the conclusions regardless of the matter referred to in finding 105.

many changes and obstructions created by Centropolis' defaults, any further work on the part of Kranz deserved extra payment. Stated somewhat differently, Kranz was saying that he had already fully earned the contract price and had no further obligation unless and until Centropolis acknowledged a right on the part of Kranz to additional payment.

The nature of Kranz's position is well illustrated by just one aspect of the work concerning which the parties were disputing immediately prior to Kranz's withdrawal from the job. An important phase of the project was the construction of an open rail cut into the underground facility. The original plans called for this cut to be excavated to a specified elevation. After work got under way, water problems made it appear that a steeper grade would be required, and the engineer therefore changed the required elevation and thereby required that Kranz excavate two feet deeper and extend the length by 400 feet. This was one of the changes which led Kranz to demand a written change order and an agreement for additional payment. When negotiations stalemated, Kranz excavated to the old original elevation and then said that he had done all that he had agreed originally to do. The engineer, on the other hand, was insisting that Kranz extend the length and take the excavation work down the additional two feet and was urging that this be done promptly so that other contrac-

tors could then continue on with further work that had to be done toward final completion for use. It is easy to see in these circumstances why Kranz would say that he had "substantially completed" the work. What he meant was that he had completed the work originally specified—he did not mean at all that he had completed the work according to the new specifications being demanded by Centropolis and its engineer in charge.[4]

The record as a whole shows overwhelmingly that the excavation, grading and cement work was not "substantially complete" on May 24, 1974. The meaning of that phrase is defined by the contract General Conditions, Sec. 1.09, as follows: "By the term 'substantially completed' is meant that the structure has been made suitable for use or occupancy or the facility is in condition to serve its intended purpose, but still may require minor miscellaneous work and adjustment." A virtually identical definition appears in *Julian v. Kiefer, supra.* The project so far as excavating, grading and cement work was far from being in a condition where the underground facility was ready for the intended use when Kranz left the job. It is unnecessary to look any further than the item of the open rail cut, which had not yet been reduced to the revised elevation and with respect to which even further work was scheduled on the part of other contractors.[5] Of course, there

---

**4.** The following testimony well illustrates Kranz's position: "Q. And at that time, [May 25, 1974] do you recall whether any work remained to be done under—and I'm not talking about extra work now—under the original contract? A. No, we had finished the work under the original contract. They were asking us to finish things in connection with it that they wanted us to do, but we had far exceeded our contract."

**5.** Appellants' witness Richwine testified: "Mr. Kranz' personnel did most of the preliminary excavation, most of the heavy excavation down to plan grade for most of the outside rail cut. Mr. Williford's people came in and took out the remaining amount of material needed to get down to the altered grade, the new grade. It was at this time that Mr. Kranz' company quit work on the job, so Mr. Williford's people end-

ed up finishing dressing out the subgrade and putting in the ballasts."

Appellants' witness Shoup testified on this same subject: "Due to the lowering of the rail grade, we were asking Kranz to perform this work to the new grade ... But he never agreed to do that. Q. Who did do that work? A. Well, Kranz came in and drilled and shot to the old original plan grade, and then left, and he stopped about 125 feet short of the tunnel floor, because the tunnel people were still working in the tunnel, and coming in and out of there, and there was a conflict in that area as to who had possession of that area for work. Q. And who completed then the excavation there to the new grade? A. Okay. The boys working on the tunnel for Mr. Williford, they got back in there while they were working on the tunnel, and they dropped back and drilled and shot that area. Q. Okay. Now paragraph two says, 'Complete rail subgrade.' What did

were many other items, some of which were essential to be done before the project could be operational, as more fully described in a summary prepared on June 4, 1974, by the engineer for the benefit of Centropolis' attorney and which appears in the record as Plaintiff's Exhibit No. 59.

The finding of the trial court, that Kranz left the work at a point where it was not yet substantially completed, is supported by substantial evidence and is not contrary to the weight of the evidence. Under that finding, the trial court applied the correct rule of law. The ruling of the trial court in these regards is therefore entitled to affirmance. *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976).

## II.

■ The issue concerning priority between the DMI deed of trust and Kranz's mechanic's lien requires initial reference to the controlling statutory provisions, Sections 429.050 and 429.060, RSMo 1978, which have appeared continuously in the statutes of this state since at least 1855. Section 429.050 provides that a mechanic's lien shall attach to the *improvements* constructed in preference to any prior lien. Section 429.-060 provides that the mechanic's lien shall be preferred to all other encumbrances on the improvements or on the *ground* but only if subsequent to the commencement of the improvements. Under Section 429.050, Kranz is entitled to a mechanic's lien with first priority as to all improvements. On the other hand, the DMI lien under its deed of trust, having been perfected prior to the commencement of any construction work, has priority under Section 429.060 with respect to the ground itself.

The DMI priority with respect to the ground, however, is subject to waiver. Kranz contends that DMI did waive its

priority and the trial court so ruled. The appellants vigorously challenge that ruling.

Whether a waiver occurred is basically a question of fact and is not susceptible to solution by rigid legal dogma. A bright line rule with respect to this question, by which waiver depended upon whether the lender at the time of the loan had actual knowledge that improvements were contemplated, was set forth by the decisions in *H. B. Deal Const. Co. v. Labor Discount Center, Inc.*, 418 S.W.2d 940 (Mo.1967) and *Drilling Service Co. v. Baebler*, 484 S.W.2d 1 (Mo.1972). In *Deal*, the holder of a deed of trust prior in time was held to have waived its priority because it had been the "prime mover" with reference to interim financing, it had arranged for participation by other banks, it had supervised disbursements for construction work and it had otherwise actively participated in the construction project. The *Deal* opinion also further states: "On the date the deed of trust was recorded the bank not only had actual knowledge that a building was to be constructed on this land, but also the bank then knew that the employment of subcontractors by the general contractor was contemplated and that the mechanics and materialmen whose labor and materials were to create the improvement might be expected to file mechanics' liens against the property if their bills were not paid. The bank had much more knowledge about the construction of the improvement than it would have had if its officials had merely visually observed excavation for a foundation (which would have constituted 'commencement of the building' and would have been notice to the world that a building was to be constructed there and if done prior to the recording of the deed of trust would have made the mechanics' liens paramount to a subsequently filed deed of trust, under all of the authorities)."

that relate to? A. All right. All this area, once you get it down in rough cuts, you still must dress it and shape it. We called for crowned subgrade on railroad, where the middle is higher than the sides, and so far, all we were trying to do is get everything cut out and out of the way so we can dress that subgrade and shape it, and make it a competent solid bearing for the ballast. Q. And who did that work? A. Mr. Williford ... Q. Now as of the time that Kranz Construction Company left the job on or about May 24, 1974, was the work, in your opinion, substantially completed? A. No. THE COURT: You're talking about the work of—MR. WOLF:—Kranz."

An even stronger statement of that broad approach was made in *Drilling Service Co. v. Baebler, supra,* where the mortgagee Prudential entered into construction and disbursing escrow agreements, thereby evidencing that it knew at the time of the loan that buildings were to be constructed, that employment of contractors was contemplated and that mechanic's liens might be expected if bills were not paid. The court pointed out that the purpose of Section 429.060 is to give notice to a prospective lender that there are materialmen or laborers in existence who expect to be paid and there will likely be additional materialmen and laborers who will also contribute to the construction or improvement. When a loan is made after construction has started, then the lender is put upon notice of existing or potential mechanic's liens and its mortgage loan is therefore properly inferior to the mechanic's liens. This is the basis of the "first spade" rule. In *Drilling Service,* substantial work had already begun when Prudential made its first loan and therefore its lien was inferior for that reason to mechanic's liens. Nevertheless, the court went on as follows: "Even apart from the 'first spade rule', the doctrine of waiver leads to the same conclusion ... In the instant case Prudential not only knew of the entire project but provided the money with which it was to be built. The Construction and Disbursing Escrow Agreements entered into by Baebler, as owner and contractor, Prudential, as mortgagee, and Security Title, as escrowee, setting forth the duties, rights and obligations with reference to the disbursement of the loans, the construction of the buildings, and the rights of mortgagee clearly show that Prudential not only had actual knowledge that buildings were to be constructed on the acreage, but also that Prudential knew that the employment of subcontractors and workmen was contemplated, and that mechanics and materialmen whose labor and materials were to create the improvements might be expected to file mechanics liens against the property if their bills were not paid. Here, as in *H. B. Deal, supra,* Prudential had much more knowledge about the planned construction than it would have had if its officials had merely visually observed the streets, utilities, gas and water mains, sewers and excavations for the basements (which constituted the commencement of the improvement and which was in existence prior to the recording of Prudential's first deed of trust). Under these circumstances Prudential is in no position to insist upon the subordination of the liens of the mechanics and materialmen and is taken to have waived any claim of priority. *H. B. Deal Const. Co. v. Labor Discount Center, Inc., supra.*"

However, the Supreme Court has in effect restricted the foregoing statements by its decision in *Westinghouse Elec. Co. v. Vann Realty Co.,* 568 S.W.2d 777 (Mo. banc 1978). In that case, Applewood purchased land to construct multi-unit apartment buildings. It executed a deed of trust to Banco to secure a loan of $2,150,000. $177,-000 of the amount represented by the note was to be and in fact was used to purchase the land. The remainder of the loan went for construction. The Supreme Court held that the purchase money portion of the deed of trust had priority over a mechanic's lien which arose out of the construction. The Supreme Court further held that Banco had not waived its priority in that regard: "We find no testimony to support a finding of waiver. There was no testimony to show involvement of Banco in the project other than as a lender of funds. Truog claims that the building loan agreement which governed disbursement of funds would support its position, but no effort to introduce that agreement into evidence was made. Truog relies solely on statements in the note and deed of trust. They are insufficient to create a waiver or to subordinate Banco's purchase money mortgage to Truog's mechanic's lien. We hold that in this case there was not evidence to support a finding of waiver. *See* Comment, 42 Mo. L.Rev. 53, 73–74 (1977). Therefore, the trial court erred in subordinating the purchase money portion of the deed of trust ($177,-000) to Truog's mechanic's lien."

In *Westinghouse Electric* the lender obviously knew at the time of the loan that construction work was in contemplation, but it nevertheless was accorded priority on the portion of the loan used to acquire the land. Accordingly, mere knowledge that improvements will be made does not suffice to subordinate the mortgage lien to future mechanic liens. *Westinghouse Electric* holds that something more by way of participation by the lenders in the construction program is necessary before waiver of the mortgage priority can result.

The issue is essentially factual. The evidence in this record adequately supports the trial court's conclusion No. 21, that the mechanic's liens of Kranz are entitled to priority over the interests, claims and liens of DMI, although DMI's deed of trust was recorded prior to the commencement of Kranz's work. DMI not only knew that Centropolis was going to build an extensive underground facility, but it actively participated in the organization of overall financing to accomplish that purpose. It, together with CMI, entered into a financing commitment which was to be carried forward in three stages. As the first stage, DMI would lend $2,750,000; as the second stage, CMI was to lend an additional $5,250,000; then in the final stage DMI was to lend $8,000,000 for the purpose of paying off the loans made in the first two stages. As part of this total program, Centropolis was obligated in a detailed way to the construction of the specified improvements. Appellants' own witness Magruder made it plain in his testimony "that the total game plan was to end up with an improved piece of property with an $8,000,000 loan, and any facet relating to that end result was to the advantage of D.M.I. . . . ."

All of this is reflected in the Loan Agreement dated August 10, 1972, between DMI and Centropolis, covering the $2,750,000 loan. Paragraph 8 of that agreement provides that the loan would be secured by the real estate described "and the improvements thereon." Paragraph 21 provides that upon request of DMI, Centropolis shall deliver a report "of the progress of the development." Paragraph 31 states that the lender shall disburse the loan funds as set forth in a schedule described in Exhibit F. That Exhibit provides for disbursement of architect's and engineer's fees incurred by Centropolis in the amount of $85,000, legal fees in the sum of $40,000 and broker's fees in the sum of $80,000. Other exhibits indicate that the legal and brokerage fees mentioned were calculated to cover all three of the loans in contemplation, not merely the initial $2,570,000 loan, and that the legal fees and broker fees were in fact paid out of the DMI $2,750,000 loan. The record shows that $20,000 was paid from the proceeds of this loan in payment of engineering fees on the project.

As part of the integration of all of the financing arrangements, the DMI loan was subordinated to the CMI loan when the latter loan was made.[6] For what would obviously seem to be for the benefit of both lenders, CMI designated St. Paul Title Insurance Company as the disbursing agent to pay the bills for labor and material on the project.

6. We do not mean to say that this subordination agreement automatically subordinated the DMI loan to all liens as to which the CMI loan would itself be inferior. Although there is no Missouri case on this point, we are aware of the decisions from other jurisdictions cited by the appellants which hold that the subordination should be confined to simply the rights of the parties to the subordination agreement. We need not and do not rule on that proposition. We do say that the subordination agreement is properly to be considered as one factor tending to show the cooperation between DMI and CMI and the general participation by DMI in the construction project.

It should be noted that on December 10, 1977, a receiver for CMI assigned its note and deed of trust to DMI. On March 1, 1978, Michael C. Kirk who was successor trustee under both the DMI deed of trust and the CMI deed of trust, gave notice of foreclosure under both deeds of trust. A foreclosure sale under both deeds of trust was held on March 23, 1978, and Bernie O. Snoddy, as nominee for DMI, bid in the property for $9,842,419.38. Snoddy transferred title to Callaway for a stated consideration of $10, and Callaway executed and delivered its promissory note dated March 23, 1978, for $8,000,000.

All of this bespeaks a very active prime role by DMI in the whole construction project. A conclusion by the trial court that this activity constituted a waiver by DMI of its lien priority comported with the evidence, did not violate the weight of the evidence, and did not conflict with applicable rules of law. The trial court ruling in this regard is therefore entitled to affirmance under *Murphy v. Carron, supra.*

Appellants argue that the trial court did not make a "finding" that DMI had waived its priority. Such a finding was implicit in Conclusion of Law No. 21. Moreover Finding No. 181 reads: "The Court further finds such other facts to be as are consistent with and in accordance with the Conclusions of Law made by the Court and the Judgment entered herein."

Appellants' second point is overruled.

### III.

The appellants' final point relates to Callaway's counterclaim for an item of $3,500. During the course of oral argument in this court, Kranz withdrew his opposition to this item of counterclaim and agreed to its allowance in favor of Callaway. Accordingly, this point is no longer in issue.

### IV.

Kranz has filed a motion for damages under Rule 84.19 on the ground that appellants have taken a frivolous appeal. That motion is overruled.

The judgment is affirmed except that the amount due Kranz as a principal balance is reduced (in the amount of Callaway's $3,500 counterclaim) from $556,321.42 to $552,821.42. That requires recomputation of pretrial interest. Using the same formula employed by the trial court in its Conclusion of Law No. 6, total interest is reduced from $211,889.65 to $210,547.49. Inasmuch as the $3,500 counterclaim relates to work on the tract of land described in the third paragraph of the judgment dated September 2, 1960, the principal sum of $3,500 and interest thereon are to be deducted from the amount of lien allocated by said judgment

to said tract. Under the authority granted by Rule 84.14, the second and third paragraphs of said judgment are amended as set forth in the Appendix hereto.

All concur.

### APPENDIX

The second and third paragraphs of the judgment dated September 2, 1980, are amended to read as follows:

IT IS ORDERED, ADJUDGED AND DECREED by the Court that plaintiff Al Kranz, doing business as Kranz Construction Co., have and recover of and from the defendant, Centropolis Crusher, Inc., a corporation, the sum of Five Hundred Fifty Two Thousand, Eight Hundred Twenty One and 42/100 ($552,821.42) Dollars principal, together with interest thereon in the amount of Two Hundred Ten Thousand, Five Hundred Forty Seven and 49/100 ($210,547.49) Dollars, making a total judgment in the sum of Seven Hundred Sixty Three Thousand, Three Hundred Sixty Eight and 91/100 ($763,368.91) Dollars, said sum to be satisfied out of the property of said defendant, Centropolis Crusher, Inc., and that execution issue therefor.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that if no sufficient property of said defendant, Centropolis Crusher, Inc., can be found to satisfy such judgment, then the residue thereof to the extent of Seventy Eight Thousand, Eight Hundred Thirty One and 31/100 ($78,831.31) Dollars principal, together with interest thereon in the amount of Thirty Thousand, Seventeen and 51/100 ($30,017.51) Dollars, making a total sum of One Hundred Eight Thousand, Eight Hundred Forty Eight and 82/100 ($108,848.82) Dollars, shall be levied on the following described real property and the buildings and improvements thereon to-wit:

TRACT 1: The North ½ of the Northeast ¼ of Section 18, Township 49, Range 32, in Kansas City, Jackson County, Missouri, lying East of and adjoining Interstate Route I-435.

TRACT 2: All that part of the West ½ of the Southeast ¼ of Section 7, Township 49, Range 32, lying South of the South line of Highway designated Route (K78) (Also called 23rd Street), as condemned and established in Cause No. 671738, in the Circuit Court at Kansas City, and being in Kansas City, Jackson County, Missouri.

TRACT 3: Part of the Southwest ¼ of Section 7, Township 49, Range 32; part of the West ½, and part of the North ½ of the Northwest ¼, of Section 18, same township and range; in Kansas City, Jackson County, Missouri, more particularly described as follows:

Beginning at a point on the East line of the Southwest ¼ of said Section 7, Township 49, Range 32, which is 1252.16 feet North of the Southeast corner of said Southwest ¼; thence West and parallel to the South line of said Southwest ¼, a distance of 1368.86 feet; more or less, to the Easterly line of Manchester Avenue as now established and as referred to in deed recorded as Document No. 620607, in Book 1083, page 436; thence in a South and Southwesterly direction along said Easterly line of said Manchester Avenue to the point where said line intersects a line 626.08 feet North of the South line of said Section 7 and running parallel therewith; thence continuing in a Southwesterly direction along the Easterly line of Manchester Avenue aforesaid, as established by right of way deed filed as Document No. 478137; recorded in Book 691 at page 524, to the South line of said Section 7;

from said point thence continuing in a Southwesterly direction into and through the Northwest ¼ of said Section 18, along said Easterly right of way line of said Manchester Avenue, also known as Manchester Road, to its point of intersection with the West line of the Northwest ¼ of said Section 18, as said right of way was established by deed filed as Document No. 479276, recorded in Book 692, page 548, said point of intersection being 337.-59 feet, more or less, South of the North-

west corner of the Southwest ¼ of the Northwest ¼ of said Section 18, measured along said section line; thence East and parallel to the South line of the Northwest Quarter to the Quarter Section line; thence North along the North and South center line of said Section 18, Township 49, Range 32, to the Northeast corner of the Northwest ¼ of said Section 18 and continuing thence North along the East line of the Southwest ¼ of Section 7, same township and range, 1252.16 feet to the point of beginning of said TRACT 3.

which property is hereby charged with the mechanic's lien of plaintiff, Al Kranz, doing business as Kranz Construction Co., to the extent of $108,848.82.