**DAVE KOLB GRADING, INC., Plaintiff,**

v.

**LIEBERMAN CORPORATION, Arbor Glen Development Corporation, et al., Defendants,**

and

**Just Labor, Inc., Jaffe Lighting Supply, Defendants,**

and

**Earl L. Hoffmann, et al., Defendants/ Appellants/Cross–Respondents,**

and

**Ronald Gass d/b/a Gass Concrete Contractors, Winter Bros. Concrete Co., Defendants/Respondents,**

and

**SCOF, Inc., Defendant/Respondent/Cross–Appellant,**

and

**J.H. Berra Construction Co., Defendant/Respondent/ Cross–Appellant.**

**Nos. 60472, 60485 and 60526.**

Missouri Court of Appeals, Eastern District, Division Two.

July 28, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 14, 1992.

Application to Transfer Denied Oct. 27, 1992.

Armstrong, Teasdale, Schlafly & Davis, Byron E. Francis, Michael A. Chivell, David G. Loseman, Lisa Wood Brickey, St. Louis, for defendant/appellant/cross-respondent Earl L. Hoffmann Homeowners, Lending Institutions and Trustees.

Curtis, Oetting, Heinz, Garrett & Soule, P.C., J. Patrick Chassaing; Charles M. Schmidt, St. Louis, for defendant/respon-dent/cross-appellant Southern Cross and O'Fallon Bldg. Products Co.

David L. Welsh, Nancy E. Emmel, Dubail Judge, P.C., St. Louis, for defendants/re-spondent/cross-appellant J.H. Berra Const., Inc.

Law Offices of R.W. Jacobsmeyer, R.W. Jacobsmeyer; Michael R. Allen, Clayton, for defendants/appellees/respondents Ron-ald Gass d/b/a Gass Concrete Contractors and Winter Bros. Concrete Co.

CRANDALL, Judge.

This appeal involves various equitable mechanics' lien actions. Defendants-appel-lants, Earl L. Hoffman, et al., who are homeowners, trustees and lending institu-tions (homeowners), appeal from the judg-ment, entered by the trial court in this court-tried case, in favor of lien claimants, Ronald Gass d/b/a Gass Concrete Contrac-tors (Gass), Winter Brothers Concrete Com-pany (Winter Bros.), Southern Cross and O'Fallon Building Products Company (SCOF), and J.H. Berra Construction Com-pany (Berra). In addition, SCOF cross-ap-peals from the trial court's denial of certain liens, its calculation of prejudgment inter-est, and its determination of the priority of the liens. Berra cross-appeals from the trial court's judgment which barred it from recovering certain escrow funds from Landmark Bank of St. Charles County. We affirm in part and remand in part.

The evidence established that it was the usual practice of Lieberman Corporation (Lieberman) to form a different corporation for each project it developed. In March 1988, Lieberman incorporated Arbor Glen Development Corporation (Arbor Glen) for the sole purpose of developing Arbor Glen Subdivision (Subdivision) in St. Louis Coun-ty. Arbor Glen was to build single family residences in the Subdivision. Arbor Glen, as the title owner of all the property en-compassing the Subdivision, conveyed title to the individual lots when it closed with the purchasers.

In May 1988, Landmark Bank of St. Charles County (Bank) issued a loan com-mitment of $4,500,000.00 to Arbor Glen to provide funds for the development of the

Subdivision. Arbor Glen designated $1,130,000.00 of that amount for the purchase of land for the Subdivision. On May 25, 1988, and May 31, 1988, Arbor Glen purchased two separate parcels of real estate, which were both conveyed by general warranty deeds. Arbor Glen recorded the deeds. On May 31, 1988, Arbor Glen executed a promissory note, payable to Bank in the amount of $1,130,000.00, which also provided for future advances of up to $4,500,000.00. On that same date, Arbor Glen executed a deed of trust to the property to Bank's trustee. The deed of trust, which described the Arbor Glen property as two distinct parcels, was recorded on June 1, 1988.

On June 30, 1988, Arbor Glen executed a promissory note payable to Bank which provided for a $4,500,000.00 revolving line of credit. Arbor Glen also executed a revised deed of trust to Bank's trustee for the parcel of real property. The revised deed of trust, which described the property as a single parcel, was recorded on July 25, 1988. The property was Arbor Glen's only asset.

Pursuant to the loan agreement with Bank, Arbor Glen was to use the $4,500,-000.00 for the purchase of the property for the Subdivision, for the development and improvement of the site, and for the construction of single-family homes on the individual lots. Bank was to disburse funds to Arbor Glen as construction progressed in accordance with draw requests which were endorsed by a title company.

In addition, although a separate escrow account was never established, there were two escrow agreements between Arbor Glen, Bank, and St. Louis County (County) which allocated funds specifically for the construction of sanitary and storm sewers and streets on the two different plats which comprised the Subdivision. The escrow agreements were in conformity with the County Subdivision Ordinance, § 1005, St. Louis County Code. Bank was to disburse these funds upon written authorization from St. Louis County Department of Planning (Dept. of Planning). The funds were part of the $4,500,000.00 loan commitment. Bank was to release the funds either to Arbor Glen or to Lieberman, rather than to make direct payments to the contractors and suppliers.

Employees of Lieberman solicited bids from contractors and suppliers and awarded contracts for the labor and materials needed to develop the Subdivision. Lieberman and Arbor Glen had the same place of business and the same employees and officers. Some of the contracts with the contractors and suppliers were with Lieberman and some were with Arbor Glen. SCOF was awarded the contract to supply lumber and millwork for the homes within the Subdivision. Berra was to install the storm and sanitary sewers for the entire Subdivision. Gass was awarded the contract to install the flatwork concrete for each house. Winter Bros. supplied the concrete to Gass for some lots and directly to Lieberman for other lots and for the common areas of the Subdivision.

During the fall of 1988, purchasers entered into contracts with Arbor Glen to buy homes in the Subdivision and deposited earnest money for the construction of homes on the lots chosen by them. After a purchaser selected the style of home and certain options, Arbor Glen forwarded documents to the various contractors entitled "Start Orders," which indicated the names of the individual purchasers and their respective lots.

In compliance with a letter from Lieberman on July 22, 1988, when Arbor Glen submitted draw requests, Bank wired funds directly to an account maintained by Lieberman at another bank. In addition, pursuant to Arbor Glen's draw requests and with the written authorization from the Dept. of Planning, Bank disbursed the escrow funds directly to the same Lieberman account. Dept. of Planning approved the release of all but $18,369.40 of the escrow funds to Lieberman. Although Bank contends that it has disbursed all of the $4,500,000.00 to Lieberman, whether Bank disbursed $18,369.40 of that sum is disputed on appeal. Lieberman, however, did not use all of the loan proceeds for the development of the Subdivision.

On or about January 3, 1989, Lieberman informed the contractors and suppliers that it would not pay them for their labor and materials. Lieberman shut down its business; and all construction at the Subdivision ceased. At that time, about twenty homes in the Subdivision were in various stages of construction and the sale of three completed homes had been closed. Arbor Glen later defaulted on the promissory note held by Bank. On February 28, 1989, Bank's trustee sold the property to Bank by sheriff's sale.

After work ceased on the Subdivision, various laborers and material suppliers served notices of their intent to file mechanics' liens on the lots of those persons who contracted for homes and deposited earnest money with Arbor Glen and whose names appeared on the Start Orders supplied to the lien claimants. In late January 1989, pursuant to a writ of replevin, SCOF recovered some of its construction materials which were not installed in the individual homes in the Subdivision. On March 31, 1989, plaintiff, Dave Kolb Grading, Inc., brought the present action to enforce its mechanic's liens. Other lien claimants joined the suit as defendants. The lien claimants also asserted claims against Lieberman and Arbor Glen for breach of contract and in quantum meruit. In addition, Berra brought an action against Bank for, *inter alia,* breach of the escrow agreements relating to the development of the Subdivision site. Homeowners entered the case as defendants.

At trial, six lien claimants presented their claims. After trial, pertinent to this appeal, the court awarded mechanics' liens against the following properties in the following amounts, excluding interest:

| Lot | Lien Claimant | Amount of Lien Upheld |
|-----|---------------|----------------------|
| 14 | Gass | $ 4,577.71 |
| | SCOF | 12,030.76 |
| | Winter Bros. | 1,765.72 |
| 15 | Gass | 2,399.74 |
| | SCOF | 12,880.55 |
| | Winter Bros. | 629.80 and $124.08 |
| 16 | Gass | 4,609.81 |
| | SCOF | 12,089.29 |
| | Winter Bros. | 1,502.10 |
| 17 | Gass | 234.00 |
| | SCOF | 7,117.29 |
| 70 | SCOF | 3,069.60 |
| | Winter Bros. | 169.93 |
| 80 | Gass | 1,386.62 |
| | SCOF | 8,931.68 |
| | Winter Bros. | 298.13 |
| 86 | Gass | 2,833.23 |
| | SCOF | 14,318.84 |
| | Winter Bros. | 1,040.86 and $102.17 |
| 87 | Gass | 682.93 |
| | Winter Bros. | 294.49 |
| 88 | Gass | 2,220.70 |
| | SCOF | 14,144.33 |
| | Winter Bros. | 890.04 |
| 89 | Gass | 1,503.36 |
| | SCOF | 9,784.72 |
| | Winter Bros. | 285.17 |
| 96 | Gass | 618.65 |
| | SCOF | 8,162.33 |
| | Winter Bros. | 301.78 and $70.03 |
| 97 | Gass | 4,945.90 |

| Lot | Lien Claimant | Amount of Lien Upheld |
|---|---|---|
| | SCOF | 13,811.45 |
| | Winter Bros. | 1,784.55 |
| 100 | Gass | 3,529.68 |
| | SCOF | 10,681.37 |
| | Winter Bros. | 1,102.15 and $70.04 |
| 101 | Gass | 2,892.47 |
| | SCOF | 13,491.31 |
| | Winter Bros. | 1,718.31 |
| 102 | Gass | 4,200.88 |
| | SCOF | 13,352.90 |
| | Winter Bros. | 1,651.10 |
| 103 | Gass | 5,074.82 |
| | SCOF | 11,930.93 |
| | Winter Bros. | 1,234.27 and $124.08 |
| 107 | Gass | 5,711.20 |
| | SCOF | 22,150.85 |
| | Winter Bros. | 1,580.22 |
| 109 | Gass | 699.35 |
| | SCOF | 9,183.50 |
| | Winter Bros. | 260.88 |
| 113 | SCOF | 2,078.00 |
| 114 | Gass | 5,073.29 |
| | SCOF | 13,178.70 |
| | Winter Bros. | 2,200.42 |
| Common Ground | Gass | 3,528.00 |
| | Winter Bros. | 1,555.82 |

The trial court denied liens to SCOF on Lots 87 and 91 and denied a lien to Winter Bros. on Lot 99. The court awarded Berra an equitable lien for $18,369.40 on its claim relating to the undisbursed escrow funds, but denied Berra recovery of the disbursed escrow funds.

■ The trial court made extensive findings of fact and conclusions of law. We are bound by the trial court's factual determination if there is substantial evidence in the record to support it. The decree or judgment of the trial court will be affirmed on appeal unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the decree or judgment is wrong. *Id.*

## HOMEOWNERS' APPEAL

Homeowners first contend that the trial court erred in awarding Berra an equitable lien against the undistributed escrow funds.[1] Berra sought, *inter alia,* an equitable lien in the amount of $18,369.40, which represented the sum which Dept. of Planning did not authorize to be released from escrow. Homeowners allege that Bank released all the escrow funds to Lieberman, including the $18,369.40, despite the lack of authorization from the Dept. of Planning for the release of that amount. Homeowners assert that nothing remains in escrow to which an equitable lien can attach.

■ An equitable lien is a remedial device which provides a method for the enforcement of an obligation. *Iota Man-*

1. Berra also brought a mechanic's lien claim which was settled without trial.

*agement Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 420 (Mo.App.1987). An equitable lien attaches to the property for the purpose of securing payment of the existing obligation and is ancillary to and separate from the debt. *Id.* The requirements necessary to establish an equitable lien are: 1) a duty or an obligation owed by one person to another; 2) a res to which that obligation fastens and which can be identified or described with reasonable certainty; and 3) an intent, express or implied, that the property serve as security for the payment of the debt or obligation. *Id.*

An examination of the written escrow agreements between Arbor Glen, Bank, and County establishes that two of the three requirements for an equitable lien are satisfied: Bank has a duty to disburse the escrow funds upon authorization by Dept. of Planning; and the escrow funds are intended for the payment of labor and materials used in the construction of the Subdivision improvements. The only remaining issue is whether there are any undisbursed escrow funds available to fulfill the requirement of the existence of an identifiable res to which an equitable lien may attach.

■ Here, the record is unclear whether Bank still holds funds in the amount of $18,369.40. During oral argument of this appeal, the parties could not agree on whether Bank released all of the escrow funds to Lieberman. If Bank is holding the $18,369.40, then Berra is entitled to an equitable lien on that amount. Conversely, if Bank disbursed the funds, then Berra is not entitled to an equitable lien because there is no res to which the lien can attach. We therefore remand the cause for the trial court to determine whether a res exists. If necessary, the court may hear additional evidence to make its determination. Homeowners' first point is therefore granted in part.

In their second point, homeowners assert that the trial court erred in holding that recovery for profit and overhead were properly includable in the liens awarded to the claimants.

■ A mechanic's lien action brought by a subcontractor is essentially an action in quantum meruit, so that the subcontractor is entitled only to the reasonable value of labor and material furnished, not the contract price. *Commercial Openings, Inc. v. Mathews*, 819 S.W.2d 347, 350 (Mo. banc 1991). Where a mechanic's lien is asserted by a subcontractor against the property of the landowner, there is normally no contractual relationship between the subcontractor and the owner and it is only by reason of the mechanics' lien statute that the property may be subjected to the payment of the lien claim. *Mitchell Eng'g, Div. of Ceco v. Summit Rlty.*, 647 S.W.2d 130, 143 (Mo.App.1982) (citing *Mississippi Woodworking Co. v. Maher*, 273 S.W.2d 753, 755 (Mo.App.1954)). The lien, therefore, is not necessarily for the contract price but is only for the reasonable value of the labor and materials furnished. *Id.* at 143.

We first address whether SCOF's recovery is limited to the cost of the materials furnished to Arbor Glen. As discussed later in this opinion, SCOF was an original contractor when it contracted with Arbor Glen to supply lumber and millwork to the Subdivision. As an original contractor, SCOF was entitled to recover the amount specified in the contract with Arbor Glen. *See Cotton v. 71 Highway Mini–Warehouse*, 614 S.W.2d 304, 306 (Mo.App.1981). Whether the charges for the materials were reasonable is not an issue, because SCOF and Arbor Glen agreed upon those charges. As an original contractor, SCOF was entitled to recover its profit and overhead because the contract price reflected profit and overhead.

■ We next consider whether the recoveries of Gass and Winter Bros. are limited to the costs of their labor and materials. As discussed later in this opinion, Gass and Winter Bros. were subcontractors under the facts of this case. As subcontractors, Gass and Winter Bros. were not entitled to the contract price, but only to the reasonable value of their labor and materials. Homeowners argue that reasonable value

under quantum meruit does not include profit and overhead.

In *Fuhler v. Gohman & Levine Constr. Co.*, 346 Mo. 588, 142 S.W.2d 482 (1940), the lien claimant, a subcontractor, was permitted to recover not only reasonable compensation for his labor and materials but also a percentage for profit and overhead. The court did not confine the claimant's recovery to what was actually paid for labor and materials. *Id.*, 142 S.W.2d at 484. The court required the claimant to show that profit and overhead were included in the value of the labor and materials and that the combined value of labor and materials and of profit and overhead was reasonable. *Id.*, 142 S.W.2d at 484–485.

■ Under a quantum meruit theory, Gass and Winter Bros. were entitled to profit and overhead as part of the value of their services as long as they proved that the total amount of those services was reasonable. The reasonable value of their labor and materials was not merely their cost, but what they could receive for their labor and materials in the market place.

The evidence established that Gass' and Winter Bros.' total charges for labor and materials were reasonable. Ronald Gass testified that the charge for concrete flatwork included profit and overhead and was calculated in accordance with industry norms. The general manager of Winter Bros. testified that the price of the concrete supplied to Gass was fair and reasonable. In addition to the testimony regarding reasonable value, the record contained invoices from Gass and from Winter Bros. which set forth the labor and materials provided in accordance with the terms of each individual contract. Lieberman did not contradict the evidence of Gass and Winter Bros. The trial court was free to believe the uncontroverted evidence of Gass and Winter Bros. of the reasonable value of their liens, which included profit and overhead. Homeowners' second point is denied.

In their third point, homeowners contend that the trial court erred in granting liens to SCOF because the evidence failed to establish that materials supplied by SCOF were actually incorporated into each particular home on which the trial court permitted SCOF to impress a lien.

■ A materialman has the burden of proving that his materials went into or were used in the specific building against which he seeks a lien. *Boyer Lumber, Inc. v. Blair*, 510 S.W.2d 738, 745 (Mo.App. 1974). Recognizing that a materialman is merely a supplier of construction materials and does not oversee the actual construction, Missouri follows the "every stick" rule which lessens the onerous burden on the materialman to demonstrate that he observed every lienable item go into the building against which he seeks a lien. *Kansas City Elec. Supply Co. v. Bomar Elec. Co.*, 581 S.W.2d 411, 413 (Mo.App. 1979). Where there is evidence that the materials forming the basis of the lien were delivered to the respective construction sites pursuant to a contract, the materialman will be entitled to a lien for those materials consumed in the erection of the structure. *Boyer*, 510 S.W.2d at 745 (citing *E.R. Darlington Lumber Co. v. Westlake Constr. Co.*, 161 Mo.App. 723, 141 S.W. 931 (1911)).

■ Viewed against the backdrop of these principles, the evidence in this case established that SCOF was the sole supplier of lumber and millwork to Arbor Glen. Based upon the model chosen, SCOF determined the lumber and millwork a particular home required. SCOF earmarked the lumber and millwork for a specific lot and delivered the materials to that lot. SCOF's invoices reflected that it furnished the lumber and millwork to a certain lot. At trial, the carpentry foreman for the construction company testified that the items on SCOF's invoices were incorporated into the homes on the respective lots. Although there was evidence that SCOF borrowed materials from one lot and used them in the construction of homes on other lots, the evidence also established that such borrowing was infrequent and that SCOF quickly replaced any borrowed materials with identical materials. There was sufficient evidence that the lienable items were incorporated into the residences on the lots on which the trial

court granted liens to SCOF. Homeowners' third point is denied.

Homeowners' fourth point claims that the trial court erred in awarding liens to SCOF because SCOF failed to file a just and true account of all lienable items. Homeowners allege that SCOF did not properly credit the individual accounts for items it replevied from the corresponding lots. As justification for their position, homeowners point to the trial court's disallowance of SCOF's liens on Lots 87 and 91 for lack of true and accurate accounts for those lots.

■ Section 429.080, RSMo (1986) requires that a lien claimant file a just and true account of the demand due as a prerequisite to a mechanic's lien. A lien statement may be regarded as just and true if it contains mistakes or errors of omission, as long as those inaccuracies are unintentional and are the result of honest inadvertence, accident, or oversight, and do not result from deliberate intention or design. *Putnam v. Heathman*, 367 S.W.2d 823, 829 (Mo.App.1963). Although there is no precise definition of "just and true," whether a lien statement meets those requirements depends upon the facts of each particular case. *Sears, Roebuck & Co. v. Seven Palms Motor Inn, Inc.*, 530 S.W.2d 695, 698 (Mo. banc 1975).

■ In the instant action, when Lieberman ceased doing business, the houses on Lots 15, 17, 70, 80, 86, 89, 96, 97, 101, 102, 103 and 109 were in various stages of completion. At that time, some of the materials delivered by SCOF to those lots had not been incorporated into the homes. SCOF obtained a writ of replevin and went to each lot to recover materials which it could recover and resell. SCOF did not, however, replevy every item which was not used in the houses on the lots. The evidence was that some unincorporated items were missing, some were not reusable, and some were locked in Arbor Glen's trailer. SCOF tallied the replevied items from each lot at the site, then transported them back to its warehouse and tallied them again. SCOF credited the individual lots with the returned items. There was sufficient evidence for the trial court to determine that SCOF's accounts for the above-mentioned lots were just and true. The trial court properly granted mechanic's liens to SCOF against those particular lots. Homeowners' fourth point is denied.

In their fifth point, homeowners contend that the trial court erred in awarding prejudgment interest to lien claimants. Homeowners first argue that, although the court had the authority to grant prejudgment interest on the amount of the mechanics' liens, such an award was not mandatory. Homeowners assert that the lack of privity between them and the lien claimants makes the award of interest inequitable.

■ Section 429.210, RSMo (1986) provides that the trial court may render judgment "in any sum not exceeding the amount claimed in the demand filed with the lien, together with interest and costs...." While the principal amount of the judgment may vary depending on the evidence, once the principal is assessed by the trial court, an award of interest is mandatory. The lack of privity notwithstanding, it would be an incomplete remedy to allow a lien for the reasonable cost of labor and materials but not interest thereon "after the account should have been paid." *Mid–West Eng'g & Constr. Co. v. Campagna*, 421 S.W.2d 229, 233 (Mo.1967). The trial court properly found that prejudgment interest was includable in the mechanics' liens it awarded to the claimants.

Homeowners next argue that if the award of prejudgment interest is mandatory, the trial court chose an improper date from which to calculate the interest due because it was not the date on which "the account[s] should have been paid." They contend that the interest should be calculated either from the date on which each lien claimant filed its lien or from the date on which the individual homeowners took title, whichever occurred later in time. The trial court awarded interest from January 3, 1989, the date on which Lieberman advised all contractors that it would not pay them.

It was a question of fact for the trial court to decide the actual date on which "the account[s] should have been paid" and from which interest should therefore be calculated. Homeowners presented no evidence which supported either of the two alternate dates which they posed as the proper dates from which to calculate interest.

In addition, SCOF contends in its cross-appeal that, as to its liens, the date upon which "the account[s] should have been paid" was the tenth day of the month following the issuance of its invoices, as requested on its invoices. The evidence does not support SCOF's contention. The record reveals that SCOF did not hold Lieberman to the due dates on its individual invoices, but rather routinely ignored the due dates. SCOF thereby waived Lieberman's compliance with payment on those dates. SCOF's argument regarding the calculation of interest is without merit.

Given the evidence before it, the trial court did not err in determining that the date on which "the account[s] should have been paid" coincided with the day on which Lieberman advised the lien claimants that it would no longer pay its bills. Homeowners' fifth point is denied.

In their sixth point, homeowners claim the trial court erred in granting priority to the mechanics' liens over Bank's deed of trust. The trial court found that Bank waived the priority of its deed of trust recorded on July 25, 1988, which it took as security for its loan to Arbor Glen. This deed of trust replaced an earlier deed of trust recorded June 1, 1988. The court concluded "[Bank] fully expected a completed subdivision which would improve their collateral when they entered into the $4.5 million loan. They thus waived their priority as a matter of law."

With regard to the priority between Bank and the lien claimants, § 429.050, RSMo (1986) provides that mechanics' liens shall attach to the *improvements* constructed in preference to any prior lien. Section 429.060, RSMo (1986) provides that mechanics' liens shall be preferred to all other encumbrances on the improvements or the *ground* subsequent to the commencement of the improvements. In the present action, absent waiver, Bank's lien under its deed of trust, if it was perfected prior to the commencement of any construction work, enjoys priority under § 429.060 with respect to the *ground* itself. Lien claimants are entitled to mechanics' liens under § 429.050 with first priority as to all *improvements*.

The purpose of § 429.060 is to give notice to a prospective lender that there are materialmen or laborers in existence who expect to be paid. *Kranz v. Centropolis Crusher, Inc.*, 630 S.W.2d 140, 148 (Mo. App.1982). When a loan is made after construction is started, the lender is put on notice of existing or potential mechanics' liens, and its mortgage loan is therefore properly inferior to those liens. *Id.* Section 429.060 gives rise to a concept known as the "first spade rule." *See Id.* The theory of the rule is that the work itself gives notice of the mechanics' liens to anyone dealing with the property.

Despite a lender's recording its deed of trust prior in time to the commencement of the construction work, the doctrine of waiver can deprive the lender of its priority with respect to the ground. Whether a waiver has occurred is a question of fact. *Drilling Service Co. v. Baebler*, 484 S.W.2d 1 (Mo.1972); *H.B. Deal Constr. Co. v. Labor Discount Center, Inc.*, 418 S.W.2d 940 (Mo.1967).

In *Deal*, the court found that the holder of a deed of trust waived its priority because it was the "prime mover" with regard to interim financing. *Deal*, 418 S.W.2d at 953. The court stated:

On the date the deed of trust was recorded the bank not only had actual knowledge that a building was to be constructed on this land, but also the bank then knew that the employment of subcontractors by the general contractor was contemplated and that the mechanics and materialmen whose labor and materials were to create the improvement might be expected to file mechanics' liens against the property if their bills were not paid.

The bank had much more knowledge about the construction of the improvement than it would have had if its officials had merely visually observed excavation for a foundation (which would have constituted "commencement of the building" and would have been notice to the world that a building was to be constructed there and if done prior to the recording of the deed of trust would have made the mechanics' liens paramount to a subsequently filed deed of trust, under all of the authorities)....

*Id.* at 953–954.

In *Baebler*, the mortgagee made its first loan to the owner and general contractor and recorded its first deed of trust after substantial work had begun, such that any reasonable observer would be put on notice of the commencement of the entire project. *Baebler*, 484 S.W.2d at 10. The court found that four deeds of trust were subordinate to the liens of the lien claimants, not only on the basis of § 429.060 and the "first spade rule," but also on the basis of waiver. *Id.* The court concluded that the mortgagee not only knew of the entire project but provided the money with which it was to be built. *Id.* Under those circumstances, the court held that the mortgagee waived any claim of priority. *Id.* at 11.

■ Here, Bank was put on notice of the potential mechanics' liens. Bank extended the loan of $4,500,000.00, secured by a deed of trust to the property, to Arbor Glen as a revolving line of credit for the entire project. Bank's senior vice-president testified that Bank funded the purchase of the ground with the intention that the Subdivision be fully built. He admitted that Bank would not have made the loan absent a plan to develop the ground. In anticipation of hiring contractors to work on the project, Bank procured title insurance coverage to protect itself when Lieberman made draws on the loan. Bank disbursed funds with the approval of the title company. Prior to disbursing funds, Bank personnel inspected the construction site to verify the progress of the construction. Bank therefore waived any claim of priori-

ty. The evidence supports the trial court's conclusion that the mechanics' liens were entitled to priority over Bank's deed of trust.

In view of our holding that Bank waived the priority of its deed of trust, we need not address whether Bank's replacement of the deed of trust recorded on June 1, by the deed of trust recorded on July 25, preserved Bank's priority. Our determination that Bank waived its priority is premised on the assumption that Bank's priority under the deed of trust on June 1 was not destroyed by the later recorded deed of trust. Homeowners' sixth point is denied.

In their seventh point, homeowners contend that the trial court erred in declaring that SCOF was an original contractor. Homeowners argue that SCOF was a subcontractor, because Lieberman was the original contractor and SCOF contracted with Lieberman, not with Arbor Glen. They assert that Arbor Glen could not be held to the contract with SCOF because Lieberman was neither an agent for, nor the alter ego of, Arbor Glen. The trial court found the following:

SCOF is an original and general contractor ..., because it contracted with ARBOR GLEN to furnish the building materials on all lots in the Arbor Glen Subdivision, and at the time of said contract and during *all* times it furnished materials to said lots, said lots were owned by ARBOR GLEN, the *record* owner.

■ SCOF's status is material because different notice requirements are imposed upon original contractors and subcontractors. Section 429.012, RSMo (1986) sets forth the notice requirements which are a condition precedent to the validity of any mechanic's lien in favor of an original contractor. Section 429.012.1 provides in pertinent part:

Every original contractor ... shall provide to the person with whom the contract is made prior to receiving payment in any form of any kind from such person, (a) either at the time of the execution of the contract, (b) when the materials are delivered, (c) when the work is

commenced, or (d) delivered with first invoice, a written notice which shall include the following disclosure language in ten point bold type:

#### NOTICE TO OWNER

FAILURE OF THIS CONTRACTOR TO PAY THOSE PERSONS SUPPLYING MATERIAL OR SERVICES TO COMPLETE THIS CONTRACT CAN RESULT IN THE FILING OF A MECHANIC'S LIEN ON THE PROPERTY WHICH IS THE SUBJECT OF THIS CONTRACT PURSUANT TO CHAPTER 429, RSMo. TO AVOID THIS RESULT YOU MAY ASK THIS CONTRACTOR FOR "LIEN WAIVERS" FROM ALL PERSONS SUPPLYING MATERIAL OR SERVICES FOR THE WORK DESCRIBED IN THIS CONTRACT. FAILURE TO SECURE LIEN WAIVERS MAY RESULT IN YOUR PAYING FOR LABOR AND MATERIAL TWICE.

Section 429.100, RSMo (1986) requires that "[e]very person except the original contractor ... give *ten days' notice before the filing of the lien, as herein required, to the owner, owners or agent, or either of them, that he holds a claim against such building or improvement, setting forth the amount and from whom the same is due....*" The two statutes require different types of notice because of the discrepancy between the owner's knowledge in dealing with an original contractor and the owner's knowledge in dealing with a subcontractor. An owner of property contracts with an original contractor and knows whether the original contractor has been paid; thus, the owner does not need notice of the filing of a lien. *J.R. Meade Co. v. Forward Constr. Co.,* 526 S.W.2d 21, 27 (Mo.App.1975). On the other hand, the property owner does not contract with a subcontractor and does not know if the subcontractor has been paid; thus, the owner is entitled to ten days' notice before a subcontractor can file a lien. *Id.*

■ The issue then is whether SCOF was an original contractor whose notice therefore had to conform to § 429.012. An original contractor is one who makes a contract to perform labor or furnish materials with the then owner of the property. *Home Bldg. Corp. v. Ventura Corp.,* 568 S.W.2d 769, 771 (Mo. banc 1978). The "owner" is defined as the person who has legal title to the real estate on the date the work commenced. *Vasquez v. Village Center, Inc.,* 362 S.W.2d 588, 596 (Mo. 1962). Homeowners concede that Arbor Glen was the record owner of all the lots in the Subdivision when SCOF contracted for and delivered the materials.

In the present action, SCOF gave notice to Arbor Glen which mirrored the language of § 429.012 on both its delivery tickets and on its invoices for each lot. The invoices with the requisite notice were delivered to Arbor Glen's office. Arbor Glen was the owner of the property. SCOF's notice, therefore, conformed to the requirements of § 429.012.

Homeowners argue that SCOF was a subcontractor because Lieberman was acting as the original contractor for Arbor Glen and SCOF contracted only with Lieberman. The trial court found, however, that SCOF's contract was "entered into with [Lieberman] as agent for and alter ego of [Arbor Glen]."

■ We consider the facts of the case as they relate to SCOF to determine whether SCOF was actually contracting with Arbor Glen when it contracted with Lieberman. Ordinarily, two separate corporations are regarded as wholly distinct legal entities. *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 737 S.W.2d 206, 218 (Mo.App. 1987). The mere fact of ownership and control does not of itself authorize piercing the corporate veil. *Id.* To disregard the existence of a corporate entity the control which plaintiff must show is "complete domination, not only of finances, but of policy and business practice *in respect to the transaction attacked* so that the corporate entity *as to this transaction* had at the time no separate mind, will or existence of its own...." *Grote Meat Co. v. Goldenberg,* 735 S.W.2d 379, 386 (Mo.App.1987). The question is whether the corporations are being manipulated through their interrelationship to cause illegality, fraud, or

injustice. *Terre Du Lac*, 737 S.W.2d at 218. The test for piercing the corporate veil is two-pronged: first, the corporation must be controlled and influenced by persons or by another corporation; second, the evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetuate a fraud. *Id.* Implicit in the test for piercing the corporate veil is that the wrong done is the proximate cause of the injury to third persons who dealt with the corporations. *Collet v. American Nat. Stores, Inc.*, 708 S.W.2d 273, 284 (Mo.App. 1986).

▪ Here, there was evidence that Lieberman dominated not only Arbor Glen's finances but also its business practices with respect to the transaction with SCOF. Based upon its longtime course of dealing with Lieberman, SCOF was aware that Lieberman created Arbor Glen as a separate entity for the sole purpose of developing the Subdivision. SCOF knew that Arbor Glen had no place of business separate from that of Lieberman. SCOF was aware that Arbor Glen and Lieberman shared common directors and officers. In addition, at the time SCOF contracted to supply materials, employees for both corporations were identical. Lieberman paid the expenses of Arbor Glen out of a central bank account into which all receipts received by Lieberman were deposited. Lieberman used the loan proceeds, which had been borrowed for the development of the Subdivision, for other uses unrelated to the Subdivision. Lieberman incorporated Arbor Glen with its sole asset being the ground on which the Subdivision was to be built. The evidence established that Lieberman completely dominated Arbor Glen with respect to the contract with SCOF. Arbor Glen, as to the transaction with SCOF, had no separate mind, will, or existence of its own. There was sufficient evidence to find that Lieberman controlled and influenced Arbor Glen.

There also was evidence to support a finding that Lieberman's manipulation of Arbor Glen resulted in fraud and promoted injustice. In the instant case, there was ample evidence of Lieberman's undercapitalization of Arbor Glen and its stripping of Arbor Glen's assets. *See Grote*, 735 S.W.2d at 387. As a result, Arbor Glen was unable to pay for the materials SCOF furnished. There was sufficient evidence to show that Lieberman used Arbor Glen as a subterfuge to accomplish the improper purpose of evading payment to SCOF.

Finally, the evidence established a causal relationship between Lieberman's actions and the harm done to SCOF. Lieberman's actions, which rendered Arbor Glen insolvent, established the requisite injury to SCOF and the causal connection. *See Collet*, 708 S.W.2d at 284.

There was substantial evidence to support the trial court's finding that Lieberman was the alter ego of Arbor Glen when it contracted with SCOF. As the alter ego of Arbor Glen, Lieberman could bind Arbor Glen to the contract with SCOF. The evidence established that SCOF dealt with Lieberman and Arbor Glen as a single unit and that Lieberman and Arbor Glen acted interchangeably in the transaction with SCOF. SCOF's contract with Lieberman was therefore a contract with Arbor Glen. Because Arbor Glen was the record owner of the property, it follows that SCOF was considered an original contractor and that its notice complied with § 429.012. Homeowners' seventh point is denied.

▪ In their eighth point, homeowners assert that the trial court erred in concluding that Gass and Winter Bros. were not required to give them notice of the filing of their mechanics' liens. Homeowners claim that, because they entered into sales contracts with Arbor Glen, they were entitled to notice as the equitable owners of the lots on which Gass and Winter Bros. sought to impress liens. The trial court found, however, that Gass and Winter Bros. were not required to give notice to the homeowners.

As stated earlier in this opinion, § 429.-100 requires that a subcontractor give ten days' notice before the filing of the lien "to the owner, owners or agents, or either of them, that he holds a claim against such building or improvement...." Assuming that Gass and Winter Bros. were subcon-

tractors, § 429.100 only requires that subcontractors give notice to the "owner." As previously stated, the owner is the person who has legal title to the real estate. In view of our discussion under point seven that Arbor Glen was the record owner of the lots within the Subdivision, Gass' and Winter Bros.' respective notices to Arbor Glen before filing their liens complied with § 429.100.

Further, Section 429.100 is clear on its face. We decline to expand the notice requirement set forth in that statute to mandate notice to equitable owners. Homeowners' eighth point is denied.

In their ninth point, homeowners claim the trial court erroneously determined that Gass was a subcontractor when it contracted with Lieberman. Homeowners' premise is that if SCOF is an original contractor under point seven, then Gass is one as well and his liens must fail because he did not meet the notice requirements of § 429.012. The trial court specifically found that Gass did not meet the notice requirements of § 429.012, although he did meet the notice requirements of § 429.100.

If Gass contracted with Arbor Glen as the owner of the property, he is an original contractor; if Gass contracted with Lieberman serving as an original contractor for Arbor Glen, he is a subcontractor. As discussed previously in this opinion, an original contractor is one who contracts to perform labor or furnish materials with the then owner of the property.

Arbor Glen was the owner of the property at the time Gass contracted to do the concrete work. Although under point seven we disregarded the corporate entities and viewed Lieberman as the alter ego of Arbor Glen when it contracted with SCOF, we consider each transaction with Lieberman and Arbor Glen separately to determine if, as to that transaction, Lieberman was functioning as the alter ego of Arbor Glen. See Grote, 735 S.W.2d at 386. The trial court specifically recognized that Lieberman and Arbor Glen were two distinct corporate entities.

The evidence adduced by Gass established that, as to his transaction with Lieberman, Lieberman functioned as an original contractor for Arbor Glen. Ronald Gass testified that he dealt with employees of Lieberman in submitting proposals for the concrete work on the Subdivision and that Lieberman accepted his proposals. Gass was not aware that Lieberman generally created different corporations for the development of each of its projects and that Lieberman specifically created Arbor Glen for the development of the Subdivision. Gass' invoices were sent to Lieberman at Lieberman's place of business. Lieberman did not tell Gass that it was acting as the agent for Arbor Glen. Further, Gass knew that Arbor Glen was the owner of the property and gave ten days' notice to Arbor Glen as required by § 429.100. Given these circumstances, Gass contracted directly with Lieberman, who was acting as the original contractor for Arbor Glen. The trial court properly found that Gass was a subcontractor and that his notice was sufficient under § 429.100.

In addition, courts will pierce the corporate veil only to correct an injustice, not to perpetuate one. Although an analysis of the facts defeats homeowners' attempt to pierce the corporate veil as to the transaction between Gass and Lieberman, Gass is the only person who is in a position to pierce the corporate veil. Homeowners were not a party to the transaction between Gass and Lieberman and cannot seek to disregard the corporate entities with respect thereto. Thus, homeowners cannot use the alter ego concept defensively to defeat the lien claim of Gass. Homeowners' ninth point is denied.

In their tenth point, homeowners contend that the trial court erred in enforcing the blanket mechanics' liens of Gass and Winter Bros. against the common ground of the Subdivision because the lien descriptions also included multiple non-contiguous lots. They argue that under § 429.040, RSMo (1986), a single lien cannot be enforced against multiple non-contiguous lots and that the liens are therefore unenforceable in their entirety. The trial court held that the liens were not enforceable against

the lots but were enforceable against the common ground of the Subdivision.

The liens sought were for labor and materials furnished for the residential sidewalk. The trial court found that the sidewalk was not connected to the lots but was strictly upon the common ground. The trial court also found that the lots were non-contiguous.

The issue is whether the lien descriptions cause the liens to be invalid under § 429.-040. Section 429.040 provides:

> When the improvements consist of two or more buildings, united together and situated upon the same lot or contiguous lots, or separate buildings upon contiguous lots, or a continuous or *connected* sidewalk in front or alongside of contiguous lots, and erected under one general contract, it shall not be necessary to file a separate lien upon each building or lot for the work done or materials furnished in the erection of such improvements (emphasis added).

Section 429.040 requires that the sidewalk be connected to contiguous lots in order to enforce a single lien against the lots. Here, the sidewalk is not connected to the lots and it is therefore irrelevant whether the lots are contiguous or not. The sidewalk is solely upon the common ground and the common ground is lienable by statute.

Further, the fact that the liens of Gass and Winter Bros. describe nonlienable property does not render them invalid. The description of the nonlienable property is simply surplusage. "[I]f more land is described than is necessary the lienable part will be charged and judgment given accordingly." *R.E. Sanders v. DeWitt,* 579 S.W.2d 707, 712 (Mo.App.1979). The trial court did not err in imposing a lien on the common ground of the Subdivision. Homeowner's tenth point is denied.

Homeowners' eleventh point claims error in the trial court's enforcement of the mechanic's liens of Winter Bros. for concrete materials which it supplied to Lots 15, 70, 86, 96, 100, and 103. Homeowners assert that Winter Bros. did not sustain its burden of proving that the materials were actually incorporated into these six specific lots. Winter Bros. sold the materials for these lots directly to Lieberman.

The record does not support homeowners' contention. Arbor Glen admitted that Winter Bros. supplied concrete materials for lots in the Subdivision. Winter Bros.' invoices enumerated the materials supplied and designated the six lots specified above as receiving the materials. Winter Bros. followed its usual procedures in preparing these invoices: after Lieberman telephoned Winter Bros.' dispatching office to order concrete for one of the lots in question, Winter Bros. initially prepared a written delivery ticket; later, Winter Bros. prepared an invoice and mailed it to Lieberman. In his testimony, Ronald Gass stated that Winter Bros.' concrete was incorporated into the lots in the Subdivision. There was sufficient evidence for the trial court to conclude that Winter Bros.' materials were incorporated into Lots 15, 70, 86, 96, 100, and 103. Homeowners' eleventh point is denied.

## BERRA'S CROSS–APPEAL

In its cross-appeal, Berra contends that it was a third party beneficiary to the escrow agreements between Arbor Glen, Bank and County; and therefore the trial court erred in denying its recovery of disbursed funds under the escrow agreements. Upon written authorization from the Dept. of Planning, Bank was to disburse escrow funds only to Arbor Glen or to Lieberman, not to the contractors or suppliers. Bank did not know whether Arbor Glen or Lieberman paid the contractors or suppliers. The trial court concluded Berra was not a third party beneficiary to the escrow agreements, that Bank owed no duty to Berra, and consequently, that Berra could not recover funds disbursed under the escrow agreements.

A third party beneficiary is one who is not privy to a contract or its consideration but one to whom the law gives the right to maintain a cause of action for breach of contract. *Laclede Inv. Corp. v. Kaiser,* 596 S.W.2d 36, 41 (Mo.App.1980).

Only third parties for whose primary benefit the contracting parties intended to make the contract may maintain an action. *Id.* "The question of intent is paramount in any analysis of an alleged third party beneficiary situation." *Id.* Third party beneficiary rights depend on, and are measured by, the terms of the contract between the promisor and the promisee. *Terre Du Lac*, 737 S.W.2d at 213.

 Beneficiaries of contracts to which they are not direct parties are divided into three classes: donee beneficiaries, creditor beneficiaries and incidental beneficiaries. *Stephens v. Great Southern Savings and Loan Ass'n*, 421 S.W.2d 332, 335 (Mo.App. 1967). The first two classes have enforceable rights against the promisor but those in the third class do not. *Id.* The general rule is that recovery by a third party is not permitted if the party is only incidentally, indirectly or collaterally benefitted by a contract. *Id.*

 Here, the escrow agreements were in compliance with § 64.060, RSMo (1986) and § 1005.080, St. Louis County Code (1985 Replacement Volume). Section 64.-060 provides that the county planning commission may regulate the subdivision of land and shall, in lieu of the immediate completion or installation of improvements, accept bond for the county in an amount prescribed by the county general attorney and approved by the county commission. County, pursuant to § 64.060, enacted the Subdivision Ordinance of St. Louis County, § 1005, St. Louis County Code. Section 1005.080 of the ordinance provides that a developer must complete the land improvements or either post bond or enter into an escrow agreement to guarantee completion of the improvements.

Arbor Glen chose to enter into escrow agreements with Bank and County. The escrow agreements were on standardized forms which County provided. The agreements guaranteed the construction, installation and completion of the required subdivision improvements in accordance with previously approved plans. Further, the agreements provided that with written authorization from the Dept. of Planning, escrow funds "may be for the payment of labor and materials used in the construction, installation and completion of the said improvements...."

The fact that the funds could be used to pay for labor and materials is not enough to confer either creditor or donee beneficiary status upon Berra. "[T]he court may not speculate from the language in the contract that the contracting parties wanted to make the plaintiff a third party beneficiary." *Laclede*, 596 S.W.2d at 42. Although Arbor Glen could have used the money deposited under the escrow agreements to pay Berra, that was neither the intent of the parties nor the primary object of the agreements. The intent of the parties was that the escrow agreements benefit County and the Subdivision property owners by allowing the Dept. of Planning to control the land division and guarantee land improvements in a timely manner, while simultaneously assuring the property owners that sufficient funds were available for development of the property.

Moreover, Arbor Glen entered into the escrow agreements in order to obtain approval from the Dept. of Planning for the Subdivision. That Berra might be paid from the escrow funds was merely a possible effect of the escrow agreements. The parties did not enter into the escrow agreements with the primary intent to benefit Berra. Thus, Berra was only an incidental beneficiary and may not recover as a third party beneficiary.

Berra further asserts that Bank owed Berra a duty to hold and disburse the escrow funds to assure payment to Berra. Berra contends that Bank's failure to do so renders Bank liable for breach of trust.

An escrow agreement creates a fiduciary relationship, and breach of the fiduciary duty constitutes a tort. *Eastern Atlantic Transp. and Mechanical Eng'g, Inc. v. Dingman*, 727 S.W.2d 418, 423 (Mo.App. 1987). An escrow agent's duties, however, are governed by the escrow agreement to which it is a party. *Southern Cross Lumber & Millwork Co. v. Becker*, 761 S.W.2d 269, 272 (Mo.App.1988). Berra was neither a party to the escrow agreements nor a

third party beneficiary to the agreements, and therefore Bank owed no duty to Berra. Consequently, Berra may not maintain an action for breach of trust.

Berra's point on cross-appeal is denied.

## SCOF'S CROSS–APPEAL

In its cross-appeal, SCOF claims that the trial court erred in denying it mechanic's liens on Lots 87 and 91. The trial court originally granted the mechanic's liens on those two lots; but subsequently, on its own motion, denied them. The court stated that the liens which SCOF filed on those lots "were so far in excess of the actual amount due that they were not true, correct and accurate liens."

To reiterate the law as set out previously in this opinion, § 429.080 requires that a lien claimant file a just and true account of the demand due as a prerequisite to a mechanic's lien. A lien statement may be regarded as just and true, so as not to vitiate the entire lien, if the inclusion of a nonlienable item is the result of honest mistake or inadvertence without intent to defraud and if the nonlienable items can be separated from the lienable items. *Sears,* 530 S.W.2d at 698–699. On the other hand, a lien statement may not be regarded as "just and true" and can form no basis for the adjudication and establishment of a lien for any part of the account where the lien claimant deliberately, with intent to defraud, includes in the account a nonlienable item knowing it to be nonlienable. *Id.* at 699. Although there is no precise definition of "just and true," whether a lien statement meets those requirements depends upon the facts of each particular case. *Id.* at 698.

The decision whether to overlook mistakes in the lien statement and treat the statement as just and true is a question of fact for the trial court. In this case, homeowners established that a substantial amount of the materials which SCOF specified in its lien statements were not actually installed into the residences on Lots 87 and 91. Faced with this evidence, SCOF voluntarily abandoned its liens as to the materials not installed. In view of SCOF's highly detailed invoices and its exact record keeping during its replevin of unincorporated materials from the Subdivision lots, the trial court could properly conclude that SCOF's lien statements as to Lots 87 and 91 were too excessive to meet the statutory requirement of a "just and true" account. Under the facts of this case, the trial court did not err in denying SCOF's liens on Lots 87 and 91. SCOF'S point on cross-appeal is denied.

In view of our earlier holdings, we need not address SCOF's remaining points on appeal.

## CONCLUSION

The judgment of the trial court granting Berra an equitable lien in the amount of $18,369.40 on undistributed escrow funds purportedly held by Landmark Bank of St. Charles is remanded for further proceedings consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.

GRIMM, P.J., and CHARLES B. BLACKMAR, Special Judge, concur.